IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| DIANE REED BRIGHT, INDIVIDUALLY, and | § | |
| as the PERSONAL REPRESENTATIVE FOR THE | § | |
| ESTATE OF DECEDENT, JAMES SCOTT REED, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | CIVIL ACTION NO. 6:20-CV-431 |
| v. | § | JURY TRIAL DEMANDED |
| | § | |
| THE CITY OF KILLEEN, TEXAS, | § | |
| ANTHONY R. CUSTANCE, RICHARD A. | § | |
| HATFIELD, JR.,  FRED L. BASKETT, AND | § | |
| CHRISTIAN SUESS, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW, Diane Reed Bright ("Bright" or "Plaintiff"), Individually as the surviving mother of James Scott Reed and as the Personal Representative for the Estate of James Scott Reed ("Reed"), deceased, complaining of Defendants the City of Killeen, Texas, more particularly the Killeen Police Department (KPD), and Officers Anthony R. Custance, Richard A. Hatfield, Jr., Fred L. Baskett and Christian Suess, in their individual and official capacities and for cause would show the Honorable Court as follows:

The individual police officer Defendants, who contrary to their false statements, were not facing the imminent threat that they claimed, violated then forty-one (41) year old Reed's Fourth and Fourteenth Amendment Rights to be free from excessive and deadly use of force. These violations were committed because of the policies and/or customs of the City of Killeen (the "City"). Specifically, the municipal body has inadequate and unconstitutional policies and/or

customs related to use of force and has a history of using controversial and dangerous no-knock warrants. No-knock raids in Killeen, Texas have led to numerous injuries and at least two fatalities, including a police detective Charles "Chuck" Dinwiddie in May 2014 and Reed in February 2019. In May 2014, Ret. Lt. Col. Larry Cole, who served on the Killeen City Council (the "Council") from 2006-2011, sent a letter to Killeen administrators and Council members calling for a suspension of "no-knock" search warrants by the KPD after the death of Dinwiddie, who was killed during an early-morning SWAT raid May 9, 2014. According to newspaper accounts, Cole reached out to the Council concerning those warrant searches prior to Dinwiddie's death and never received a response. His position was that there is too much risk when executing no-knock warrants. Nevertheless, with a clear disregard for the dangers inherent in the execution of no-knock warrants, the KPD executed another no-knock warrant only three (3) months after a detective was killed during a raid with full knowledge of the inherent danger.

Furthermore, the KPD has not accounted for the trauma among civilians, including bystanders and neighbors, and police officers while enduring what can accurately be described as a war zone with glass, bullets, and shrapnel flying. Other law enforcement agencies across the country, including the Houston Police Department, have determined that the risks associated with no-knock raids outweigh the benefits. However, despite the proven dangers, the KPD has persisted in the use of this controversial tactic by executing approximately eighty-one (81) no-knock raids since 2012 without instituting any additional training or precautionary measurements.

Plaintiff herein complies with the pleading requirements of FRCP Rule 8(a)(2) and the requirements of *Ashcroft v. Iqbal*, 556 U.S. 129 S.Ct. 1937, 1949 (2009) that "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."

## I.

## NATURE OF THE ACTION

1.      This is an action brought by the Plaintiff against The City of Killeen, Texas, and Officers Anthony R. Custance, Richard A. Hatfield, Jr., Fred L. Baskett and Christian Suess, for conspiracy and for their use of excessive and deadly force resulting in the death of Reed under the color of law, in violation of his individual rights under the Fourth Amendment of the United States Constitution and, consequently, in violation of his civil rights pursuant to 42 U.S.C. § 1983 and § 1985.

2.      The Plaintiff alleges that the Killeen City Council, the City of Killeen's final policymaker for the Killeen Police Department, vested with all powers of the City and with the determination of all matters of policy and Chief of Police, Charles F. Kimble ("Chief Kimble"), vested with the authority for setting policies, including training of the Killeen Police Officers, had a duty, but failed to implement and enforce such policies, practices and procedures for the KPD that respected Reed's constitutional rights to protection and equal treatment under the law.

3.      The Council and Chief Kimble's failure to implement the necessary policies and the (de facto) implementation of unconstitutional policies, unnecessarily caused Reed to die at the hands of police officers who engaged in the excessive and deadly use of force after invading his home using the vicious tactic of a no-knock, no-announce raid.  The officers then conspired to cover up their excessive and deadly acts.  For these civil rights violations and other causes of action discussed herein, Plaintiff seeks answers and compensation for damages.

## II.

## PARTIES

4.      Plaintiff, Diane Reed Bright, is a citizen of the United States and a resident of Killeen, Texas.  As his mother and surviving next-of-kin, Diane Reed Bright is acting as the Personal Representative for the Estate of James Scott Reed.

5.      Defendant, the City of Killeen, is a municipality located in Bell County, Texas. The City of Killeen funds and operates the KPD, which, along with the Council, Killeen City Manager's office and Chief Kimble, are responsible for the implementation of the KPD's budget, policies, procedures, practices, and customs, as well as the acts and omissions, challenged by this suit. The KPD is also responsible for preventive, investigative, and enforcement services for all citizens of the City of Killeen. All actions that form the basis of this lawsuit were performed pursuant to policies and procedures, customs and practices of Defendant, the City of Killeen. The City's responsibility and duty to promulgate, implement, train and enforce policies and procedures prohibiting unlawful detentions, arrests, and exercises of excessive and deadly force, in violation of minimum constitutional and statutory requirements; to properly hire, fire, discipline, train and supervise police officers.  The City of Killeen may be served with citation for service of process on Mayor Jose Segarra, 101 N. College St., Killeen, Texas 76541 or wherever he may be found.

6.      Defendant, Anthony Custance ("Custance"), upon information and belief, is a resident of Killeen County, Texas, and, at all times material herein was a police officer allegedly acting in the course and scope of his employment for The City of Killeen and KPD.  At all times relevant to this lawsuit, it was former Officer Custance's duty and responsibility to treat all

persons in compliance with constitutional and statutory requirements and in compliance with the KPD's rules, regulations, policies and procedures, customs and/or practices relating to detention, arrests and the use of deadly force.  Custance is being sued in this lawsuit in both his individual and former official capacity.  Defendant Custance may be served with citation at the Killeen Police Department, 3304 Community Blvd, Killeen, Texas 76542 or wherever he may be found.

7.      Defendant, Richard A. Hatfield, Jr. ("Hatfield"), upon information and belief, is a resident of Killeen County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of Killeen and KPD.  At all times relevant to this lawsuit, it was Officer Hatfield's duty and responsibility to treat all persons in compliance with constitutional and statutory requirements and in compliance with the KPD's rules, regulations, policies and procedures, customs and/or practices relating to detention, arrests and the use of deadly force.  Officer Hatfield is being sued in this lawsuit in both his individual and official capacity.  Defendant Hatfield may be served with citation at the Killeen Police Department, 3304 Community Blvd, Killeen, Texas 76542 or wherever he may be found.

8.      Defendant, Fred L. Baskett ("Baskett"), upon information and belief, is a resident of Killeen County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of Killeen and KPD.  At all times relevant to this lawsuit, it was Officer Baskett's duty and responsibility to treat all persons in compliance with constitutional and statutory requirements and in compliance with the KPD's rules, regulations, policies and procedures, customs and/or practices relating to detention, arrests and the use of deadly force.  Officer Baskett is being sued in this lawsuit in both his individual and official capacity.  Defendant Baskett may be served with citation at the Killeen Police Department, 3304 Community Blvd, Killeen, Texas 76542 or wherever he may be found.

9.      Defendant, Christian Suess ("Suess"), upon information and belief, is a resident of Killeen County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of Killeen and KPD.  At all times relevant to this lawsuit, it was Officer Suess' duty and responsibility to treat all persons in compliance with constitutional and statutory requirements and in compliance with the KPD's rules, regulations, policies and procedures, customs and/or practices relating to detention, arrests and the use of deadly force.  Officer Suess is being sued in this lawsuit in both his individual and official capacity.  Defendant Suess may be served with citation at the Killeen Police Department, 3304 Community Blvd, Killeen, Texas 76542 or wherever he may be found.

### III.

### JURISDICTION AND VENUE

10.     42 U.S.C. §1983 and 42 U.S.C. §1988 provide jurisdiction over Plaintiff's constitutional claims for redress, which are conferred on this Court by 28 U.S.C. §1343(a)(3).

11.     Federal question jurisdiction is conferred on this Court by 28 U.S.C. §1331, because this action arises under the Constitution and laws of the United States.

12.     This Court also has pendant jurisdiction over all other claims asserted under the laws of the State of Texas, pursuant to 28 U.S.C. §1367(a).

13.     Venue is proper in the Western District of Texas, Waco Division, as this is the district where the claim arose in accordance with 28 U.S.C. §1391(b).

**IV.**

**DUTY AND LAW APPLICABLE**

14.     Reed was subjected to excessive and deadly force, a violation of his rights guaranteed to him by the Fourth Amendment of the United States Constitution.

15.     Plaintiff commences this action pursuant to 42 U.S.C. §1983, which provides in relevant part for redress for every person within the jurisdiction of the United States for the deprivation, under color of state law, of any rights, privileges, or immunities secured by the Constitution and laws of the United States.

16.     Officers Custance, Hatfield, Baskett and Suess were acting under the color of law and are liable under 42 U.S.C. § 1983 and § 1985 for conspiring to cover up the excessive and deadly acts.

**V.**

**FACTS**

**The No-Knock No-Announce Raid**

17.     On February 27, 2019, during the early morning hours at around 6:00 a.m., approximately eighteen (18) Killeen Police Officers, including Defendants Custance, Hatfield, Baskett and Suess, executed a no-knock narcotics warrant at Reed's apartment, which was a single-story duplex located at 215 West Hallmark Avenue, Apt. A,  Killeen, Bell County, Texas.

18.     Prior to the execution of the warrant, the KPD obtained the no-knock narcotics search warrant through the use of an affidavit from a KPD officer partially based on information from an alleged confidential informant, who upon information and belief may have been connected to an incident that resulted in Reed's home being fired upon just a week before no-knock raid.  Both Reed and an unidentified female were listed on the warrant.

19.     The affidavit asserted that a no-knock no-announce night-time raid was necessary primarily because a taser allegedly had to be used against Reed during an arrest which occurred a decade ago.  It also alleged that Reed had a dangerous criminal record and had firearms in the home, although his record contains no specific gun charges and no narcotics distribution charges.

20.     KPD's SWAT Team consisted of three (3) main parts for the execution of the no-knock warrant:  a window team, a breaching team and an entry team.  The window team was positioned on the rear west window which was the master bedroom of Reed's apartment. Defendants Hatfield and Suess were assigned as lethal coverage for the window team; and Defendant Baskett was the shield barrier for the window team.  There were three additional members of the window team.  Defendant Custance was not a member of the window team but was assigned as the entry team rear guard, which duties he failed to comply with.

21.     The execution of no-knock narcotics search warrant on Reed's residence before sunrise on February 27, 2019 was chaotic and fraught with issues.  At the scene, during the execution of the no-knock raid, numerous officers descended upon Reed's apartment in the darkness.  After a charge was set off at the front door, a member of the window team, Officer Swan, used a window breaking tool to break Reed's bedroom window and initiated a Flash Noise Diversionary Device ("FNDD") into the window.  In the aftermath, there was broken glass and smoke from the FNDD.  There were obstructions to the view inside the bedroom window including a curtain or blanket hanging from the window and trees.

22.     After numerous shots were fired at Reed by officers Custance, Hatfield and Baskett, for no lawful reason, Reed was pronounced dead on the scene after a period of suffering from the gunshot wounds.  According to the autopsy report prepared by the South Western Institute of Forensic Science, Reed suffered traumatic injuries to his vital organs from a single

gunshot wound.  The projectile entered just under his right armpit, traveled through both lungs and severed his aorta.

23.     After the raid, the KPD determined who Reed's shooters were based upon their own admissions or denials during interviews as to whether they shot their firearms during the no-knock raid.  At the briefing after the raid, all of the officers who participated in the raid, other than Hatfield and Baskett, denied shooting their firearms including Custance.  Everyone was allowed to go home after writing their reports and without being fully interrogated and/or interviewed.

### The Rangers Investigation

24.     At the request of the KPD, an investigation of the officer involved shooting of Reed  was commenced by the Texas Rangers Department.  Ranger Adam Russell ("Russell"), who was assigned as the lead investigator, arrived on the scene, at approximately 8:00 a.m., after the search warrant was executed.  During the investigation, Ranger Russell was assisted by Rangers Justin Duck ("Duck") and Randy Lewis ("Lewis").

25.     Ranger Russell met with KPD Sergeant Adam Wilts ("Wilts") for his briefing and then conducted a walk-through of the scene.  Wilts stated that Reed was killed by KPD SWAT officers after he allegedly produced a handgun and opened fire on the officers.  Wilts informed Ranger Russell that only two (2) SWAT members, Hatfield and Baskett, shot at Reed.  Wilts stated that Suess sustained minor injuries and that Suess had stated that he was unsure if he shot or not.

26.     During the investigation, Ranger Duck conducted an in-custody recorded interview with Eva Marie Brocks ("Brocks"), which the interview summary stated was "at home" with Reed in the bedroom when the police conducted the dangerous and unnecessary

raid.  The interview was conducted after Brocks had just witnessed Reed's shooting death and had been placed under arrest for possession of a small amount of cocaine that was allegedly found at the location of the raid.  Ms. Brocks, under stress and the trauma of witnessing the death of Reed, initially indicated that she did not see whether Reed shot at the police or not but later confirmed that Reed had not fired any shots in a written statement. Brocks stated that Reed had recently obtained a small gray gun and a shotgun after his apartment had been shot up just two weeks before the raid.  The police were called, and they came to the scene after the drive-by shooting and in fact, recommended that Reed obtain protection for his home.  During the raid, Brocks stated that she only realized that the police were outside after they stopped shooting.  It was only then when she heard someone yell "police."  At no time prior to firing did any officer identified himself.

27.     At the scene, right after Reed was shot to death, Detective Xavier Clark took custody of Brocks after she had already been cuffed by another officer.  Clark described Brocks as hysterical and said she indicated she did not believe that Reed shot at officers.  She asked Clark whether Reed had shot at officers.  Clark indicated that he had.  Brocks described the chaotic scene with a loud bang, another bang and then glass falling on both of them.  She described hearing pops and then rapid gunfire.  Brocks never said she saw Reed shoot at officers. In a written statement offered outside of the hysteria of the scene and the stress of being under arrest, Brocks reiterated that the police did not announce themselves before the shots began.  As mentioned above, she also stated that Reed did not shoot at officers.  In fact, she indicated that Reed would have not been able to fire any shots as fast at the unannounced shooting commenced.

28.     During his initial walk through, Ranger Russell almost immediately determined that there was likely a third police officer who shot at Reed during the execution of the warrant based upon his observation of ten (10) bullet defects under the bathroom window. Ranger Russell determined that all the bullet defects were shot from the outside into the residence due to the presence of "bullet wipe." A bullet wipe is the dark area around the margins of a bullet hole, caused by bullet lubricant, lead, smoke, bore debris or possibly jacket material.  It can be useful for identifying an entry site (as opposed to an exit site).  According to Ranger Russell, the angle of each defect seemed to track towards the west side broken window of Reed's master bedroom.

29.     Sergeant Wilts attempted to explain away the likely possibility of a third shooter by relaying that there was no one assigned to be on the northeast corner or the house. Sergeant Wilts also advised that KPD had responded to a drive-by shooting at the Reed residence about a week prior in an effort to explain the bullet defects.  This confirmed what Brocks told the Ranger about the police being called after the drive-by shooting.  Even though the KPD was fully aware of who Brocks was, they did not list her by name on the search warrant application.   In the Rangers investigative report, they identified Brocks as being "at home" with Reed.  The KPD also could have easily ascertained that Brocks has two minor children who could have been present during the execution of the no-knock warrant.  Although relevant, they also did not mention the recent drive-by shooting on the warrant application.  The KPD, knowing that Reed was recently fired upon, should have not instituted a no-knock warrant fully knowing they were placing everyone in danger.  There was also no indication in the investigative report that the SWAT team members were briefed on the fact that there had been a recent drive-by shooting at the location of the raid.

30.     During the course of the investigation, Ranger Duck marked fired cartridges behind the Reed residence on the north side.  These cartridges were associated with the ten (10) defects that Ranger Russell found during his initial walk through.  Russell examined one of the cartridges, identified as a Federal .556 caliber rifle cartridge. The cartridge was determined to be the same manufacture and caliber issued to the KPD SWAT team.  Russell informed KPD Sergeant Manges and Sergeant Wilts that a third SWAT member had in fact shot at Reed and had covered it up by lying about it.

31.     Due to the cover up, the KPD SWAT Team was recalled to the Annex for a meeting with Russell at approximately 6:30 p.m. on the same day of the raid.  Russell relayed the evidence at the scene to the entire raid team which showed that a third SWAT member had shot at Reed a minimum of ten times.

32.      At the meeting, Officer Custance, who previously lied and told supervisors that he did not shoot his firearm at the scene, admitted that he did shoot at the back of the Reed residence.  He alleged that he began shooting when he saw muzzle flashes and heard gunfire. However, Custance did not explain why if this were true, he lied about it right after the incident. According to the Rangers investigative report, Custance was not questioned any further at that time so that he could speak to his legal representative.  Russell took possession of and inspected Custance's rifle, an HK-416D assault rifle.  The weapon was unloaded and Custance admitted that he had reloaded his magazine after the raid.  The Defendant officers were fully aware of Custance's failure to fully disclose that he fired at Reed. Prior to the follow up meeting, Defendant Custance texted Detective Jason Petty, the entry team leader, to ask him what the purpose of the meeting was.  As Petty described it, Custance was stressed out and Petty could not

understand why until Custance was later forced to admit that he had in fact shot at Reed during the warrant execution and had blatantly lied about it.

## The Defendants' Misconduct and Conspiracy

33.     To justify their unlawful shots at Reed, during the Rangers investigation the Defendants continued to tell a story that Reed allegedly stuck his arm out of the window and shot at officers with a handgun before they returned fire.  The Defendants each had five (5) to seven (7) days before being required to give written statements.  The Defendants based this story around the allegation that there was a small gray .380 Cobra pistol found near the right hand of Reed's dead body on the floor of his bedroom.  To cover up for the failures to follow protocol and policy by all of the Defendants, they used that information to tell a specific story that the initial gunfire was from Reed using a small arms pistol or handgun and therefore could not have been from Custance's rifle or from Baskett's handgun or another police shooter's handgun.

34.     According to Defendant Hatfield's statement given five (5) days after the raid, after breaking the glass, Officer Swan pulled the pole out of Reed's bedroom window as Baskett and Suess approached the window.  Swan then stepped back, and Hatfield gave him the less than lethal launcher.  Then Hatfield alleges that he heard a "pop" from a handgun in the direction of Reed's bedroom window.  Hatfield then claims to have observed a right hand and arm holding a "black" in color handgun coming out of the bedroom window being pointed directly at Officer Baskett and Officer Suess.  Hatfield alleges that he *heard* the person inside the residence that was holding the handgun outside the window continue to fire approximately two to three more times.

35.     Defendant Hatfield stated that he then observed Officer Suess fall back on the ground and then saw Baskett immediately making steps back to get away from the alleged threat

which opened up a clear shot at Reed for Hatfield. Defendant Hatfield stated that after Reed allegedly fired at officers, he pointed his rifle and fired approximately four (4) times and Reed backed into the bedroom.  In an attempt to explain the timing of Baskett's shots using a handgun, Hatfield also specifically claims that as he was firing he heard more gun shots coming from outside from a handgun that "belonged to another window/containment team member".  Hatfield stated that when he stopped firing, he did not see or hear any additional shots.  According to Hatfield, Baskett and Custance, both of whom shot a minimum of ten shots with a handgun and rifle respectively, would have had to complete their shots prior to Hatfield's three to four shots.

36.     In his sworn statement provided five (5) days after the incident, according to the summary in the Rangers investigative report, Defendant Custance indicated that he was carrying a H&K, 5.56 caliber rifle as well as a Sig Sauer, P320, 9mm semi-automatic pistol during the raid. He stated that he was assigned to the  entry team and that as they were moving to the southeast order of the house, Petty directed him to hold a security position on the northeast corner of the house.  He stated that it was his job "to watch for any movement dangers that many have presented themselves that would disrupt the operation."  After he heard the FNDD breach the window, Custance stated that he heard several shots fired from that side of the house almost immediately and then he heard "shots fired" on the radio.  At this point, Custance indicated that he was concerned that there would be crossfire from the window team, so he moved to the north side of the property approximately thirty (30) to forty (40) feet away from the house. Custance, at no time was in his assigned position.

37.     Custance claims that he saw muzzle flashes and "suspected" that they were from someone inside the room shooting toward the window team.  He fired "several rounds" of his rifle in the direction of where he allegedly saw the muzzle flashes coming from.  He then stated

that he believed that there was an unlawful and deadly assault  against the other officers and that

"the person inside of the room was clearly firing a weapon."   Custance did not indicate that he

heard shots fired by any other officer.

38.     As mentioned previously, at the briefing after the raid, Custance was asked

whether he fired either of his weapons during the raid and he told the investigator that he did not.

In his statement, Custance indicated that he lied because he was in shock and because he was

uneasy that other officers would be concerned about being in the line of fired based on the angle

he shot from.

39.     In his statement provided eight (8) days after the incident, Defendant Baskett also

alleges that he saw a gun come out of bedroom window and heard approximately two to three

shots fired "from the suspects handgun".  Baskett alleges that he then drew his department issued

handgun and began to shoot at Reed who was still holding a gun and pointing it out of the

window.  However, that would have been at the same time that Haskins says Reed was backing

into the bedroom.

40.     In his statement provided eight (8) days after the incident, Defendant Suess also

claims to have observed a black arm holding a handgun come out of the bedroom window.

Suess alleges that the handgun fired two times in a fast manner and that he then observed Baskett

fire his gun at Reed in response.  Suess stated that he did not fire at Reed since he was unable to

see the subject and did not want to shoot wildly into the residence.  If Suess could not see the

subject from his location, then Custance certainly could not see Reed from his location which

was further away.

41.     Two of the shooters,  Hatfield and  Baskett, in addition to Suess, were the only

officers who claim to have seen Reed's arm/hand come out of his bedroom window and shoot a

handgun three to four times.  Custance claimed someone was shooting from the bedroom but he did not describe how other than that he saw muzzle flashes and heard gunfire.  There was no evidence of Reed shooting his gun multiple times as claimed by the Defendant officers.

42.     Despite the fact that he was a member of the window team and was close in proximity to Hatfield, Officer Swan did not join in the story by claiming to also have seen Reed's hand or arm come out of the window shooting from a handgun.  Swan stated that as he was transitioning, he *heard* several gun shots "go off at the window".  He retrieved his launcher and took up a position on the corner with Hatfield. Nevertheless, Swan specifically stated that he "did not observe the target, Reed, fire or which officers returned fire" despite the fact that he was near Hatfield and then said he was near Custance.

43.     The close relationships between the Defendants is apparent from their statements. Defendant Hatfield expressed his concern for Suess who he described as his "very close friend". Despite the presence of other officers, it was Defendant Custance who came to Suess' location and assisted him in leaving the immediate area in order to be evaluated by medical staff.

44.     Despite their detailed descriptions of the shots that were allegedly fired, neither of the other two shooters, Hatfield and Baskett, nor Suess, admitted to hearing the third shooter Custance's rifle shots at Reed.

45.     The Rangers investigation revealed that by the end of April 2019, Custance had resigned from the KPD.  In June 2019, evidence was presented to the Bell County grand jury that Custance lied, concealed and altered evidence during the investigation. The grand jury returned a true bill of tampering with physical evidence against Custance.  In September 2019, Custance pleaded guilty to felony tampering with physical evidence.  In December 2019, Custance was

sentenced to six (6) years deferred adjudicated probation and lifetime relinquishment of his Texas Peace Officer's license.

**The Forensic Evidence**

46.     In the Rangers investigation, there were thirteen (13) 5.56 fired cartridges, eight (8) 9mm fired cartridges and one (1) 9mm brass fired cartridges recovered.  Except for the one brass cartridge, these findings are consistent with the handgun shot by Baskett and rifles fired by the Custance and Hatfield.

47.     Ranger Russell processed the handgun found in Reed's bedroom on March 4, 2019.  It was described as a silver semi-automatic .380 Cobra handgun.  Russell also photographed the fired .380 brass cartridge that was lodged in the chamber.  He noted that this commonly called a "stovepipe".  He ejected the fired .380 brass cartridge which was stamped WIN .380 AUTO on the primer.  The .380 Cobra handgun and the 380 brass cartridge were sent to lab for firearms and tool mark analysis.

48.     A stovepipe jam usually occurs in semi-automatic or fully-automatic firearms and is a failure-to-eject malfunction, (i.e.) the cartridge that was just fired did not get ejected from the firearm properly and the cartridge case is partially stuck in the ejection port.  This means the weapon cannot load the next cartridge into the chamber properly and will not fire.

49.     The magazine in the handgun found in Reed's bedroom was filled to capacity with seven (7) rounds of the same.380 ammunition.  Therefore, there is no evidence that the handgun was fired prior to or after the stovepipe occurred, contrary to the stories of the Defendant officers.

50.      There were no fired .380 brass cartridges located at the scene that supported Defendants Hatfield, Baskett, and Suess' unified story that Reed stuck his arm out of his bedroom window and fired two (2) to four (4) shots at the officers from a handgun.

51.      The Rangers took DNA swabs from the .380 handgun and sent them to the lab for comparison to the DNA from Reed's standard blood taken from his person at the autopsy. The DNA results matched.  However, this does not prove that Reed shot the gun out of the window as alleged since the gun was fully loaded with one cartridge jammed in the chamber.

52.      The sole Gun Shot Residue (GSR) analysis that was conducted was on a specimen collected from Defendant Suess' face.  The results were that six (6) characteristic gunshot primer residue particles were confirmed.  However, the results do not prove that the residue was a result of Reed firing a gun several times near Suess' face.  The test results stated that the findings were consistent with several scenarios such as having recently fired a weapon; or having been in immediate proximity of a weapon as it is being fire; or coming into contact with a surface containing gunshot primer residue particles.

53.      Reed's fingernail clippings from both hands were collected as was a GSR collection kit but it is not clear whether the tests were ever done, and no test results were mentioned in the Rangers report.  All of the collected evidence, to include these items, was released back to the KPD on November 4, 2019 once the investigation had concluded.

# VI.

## <u>THE CITY'S POLICIES, CUSTOMS AND PRACTICES</u>

54.     Based on the evidence, Officers Custance, Hatfield, Baskett and Suess failed to conduct an objectively-reasonable assessment of the facts, before firing at Reed.

55.     Despite their fabricated cover-up story, Officers Custance, Hatfield and Baskett were not facing or reacting to an imminent threat of death or serious bodily injury to them or any other person at the time they fired at least twenty-three (23) shots at Reed.

56.     Based on the evidence and statement of Brock, Reed did not reach his arm or hand out of his bedroom window and fire the initial two to four shots at the officers with a handgun contrary to the statements made by Hatfield, Baskett and Suess.  Furthermore, Custance, knowing that their actions were wrong, lied about being a third shooter at Reed and tampered with evidence to cover it up.  Despite the fact that the evidence clearly shows that the handgun found near Reed's body was jammed and he could not have actually shot the gun out of the window, Officers Hatfield, Baskett and Custance chose to use deadly force, violating applicable use of force policies.

57.     This horrible tragedy was 100% preventable:  The Rangers investigation proves that all four Defendant officers lied about the shooting in an effort to cover up their failures to act in an objectively reasonable manner.

58.     Officers Custance, Hatfield and Baskett unlawfully shot and killed Reed without any warning, although they were not in imminent danger <u>and</u> when less deadly alternatives were available.

59.     Officers Custance, Hatfield and Baskett failed to conduct an objectively, reasonable assessment of the facts when they chose to start shooting at Reed.  The evidence

shows Reed did not shoot at them first or at all.  That story was fabricated after Hatfield, Baskett and Custance all shot at Reed and he was killed.  In an attempt to justify their unprovoked use of deadly force, Custance lied and tampered with evidence, and Hatfield, Baskett and Suess conspired to fabricate a story that Reed stuck his arm out of the window and shot at them first.

60.     According to Reed's autopsy report, he received one (1) gunshot wound to the right side of his chest.  Reed was pronounced dead in his home at the scene of the dangerous and unnecessary raid.

61.     Despite the unlawful fatal shooting of Reed, Officers Hatfield and Baskett have not been terminated.  Despite conspiring to develop a false cover story with Defendants Hatfield and Baskett during the investigation, Officer Suess also has not been terminated.   Upon information and belief, these officers have not been disciplined.  Officer Custance resigned and then was indicted and pleaded guilty to tampering with evidence.

62.     Officers Hatfield, Baskett and Custance's actions tragically took Reed's life and are the logical and unconstitutional consequence of the KPD's odious and illegal pattern, practice, custom, and de facto policy of using unreasonable and unjustifiable force on suspects.

63.     The KPD's written policy on use of force is not the de facto policy of the KPD. The de facto policy is that which Officers Custance, Hatfield and Baskett employed when they decided to approach and fire shots at Reed without warning and any attempt to de-escalate.

64.     The KPD did not provide adequate training to Officers Custance, Hatfield, Baskett and Suess on proper procedures and techniques for the execution of no-knock warrants.

65.     The KPD did not provide adequate training to Officers Custance, Hatfield, Baskett and Suess on appropriate methods and techniques to control situations similar to the one encountered by them and other responding officers on February 27, 2019.

66.     The Killeen City Council, the City's final policymaker, Chief Kimble and the City knew or should have known that the training provided to Officers Custance, Hatfield, Baskett and Suess was inadequate or nonexistent.

67.     Officers Custance, Hatfield, Baskett and Suess' unlawful and unwarranted acts, lack of training and the official customs or policies of the KPD was the proximate cause of Reed's death. The City ratified the wrongful acts of the Defendant officers.

68.     At all times material hereto, former Officer Custance, and Officers Hatfield, Baskett and Suess were believed to be acting in the scope of their employment as agents, servants, and employees of the KPD, a part of Defendant, the City of Killeen within its executive branch and were performing a governmental function.

69.     Moreover, no reasonably competent officer would have concluded that Officer Custance, Hatfield, Baskett and Suess' actions described herein would not, and did not, violate Reed's constitutional rights. In other words, no reasonably prudent police officer under similar circumstances could have believed that Officers Custance, Hatfield, Baskett and Suess' conduct was justified.

## VII.

## <u>DAMAGES</u>

70.     As a direct and proximate result of Officers Custance, Hatfield, Baskett and Suess' conduct, the Plaintiff has sustained substantial damages and pecuniary loss.

71.     Reed was forty-one (41) years old when he was murdered by Officers Custance, Hatfield and Baskett.  He was in good health, with a reasonable life expectancy of living at least 39 more years to age 80.  Reed leaves behind his mother and his siblings.

72.     The Plaintiff has suffered pecuniary loss from the death of her son by virtue of the destruction of the parent-child relationship, including the right to love, affection, solace, comfort, companionship, society, emotional support, and happiness.  The Plaintiff will suffer anguish, grief, and sorrow as a result of Reed's death and is likely to continue to suffer for a long time in the future. The closeness of Plaintiff's relationship with Reed is demonstrated by the fact that Brocks, still hysterical and traumatized, called Bright the moment she realized Reed had been killed by officers.  For these losses, the Plaintiff seeks damages in a sum in excess of the minimum jurisdictional limits of the court.

73.     Upon information and belief, the KPD has not implemented policies and procedures to aggressively curtail death and/or injuries as a result of the improper use of deadly force and the execution of no-knock warrants and has not disciplined officers, specifically Officers Hatfield, Baskett and  Suess, who were involved in the unlawful shooting and the cover-up of a crime.

**VIII.**

**CAUSES OF ACTION**

**First Cause of Action**
**Unconstitutional Use of Excessive Force**
**42 U.S.C. § 1983 Violation of the Fourth Amendment**
**by Defendants Custance, Hatfield and Baskett**

74.    Plaintiff hereby adopts, incorporates, re-states and re-alleges paragraphs 1 through 73, inclusive, with regard to all causes of action.

75.    Officers Custance, Hatfield and Baskett, acting under color of law, used unreasonably excessive and deadly force when they fired upon and killed Reed for no lawful reason. In fact, Officers Custance, Hatfield and Baskett had not verified if Reed had actually shot at officers.  Officers Custance, Hatfield and Baskett's fired into or toward Reed's bedroom window and then colluded to develop a false justification by saying he shot at them first.  These actions were reckless, were done with malice and placed innocent individuals at risk, including Reed and Brock.

76.    Officers Custance, Hatfield and Baskett's actions violated Reed's constitutional rights giving rise to Plaintiff's claims pursuant to the Fourth Amendment and 42. U.S.C. §1983 and other applicable law.

77.    Officers Custance, Hatfield and Baskett violated Reed's constitutional rights to be free from excessive and deadly force. This right was clearly established at the time of the shooting.

78.    Nothing that Reed did posed an imminent threat to the safety of Officers Custance, Hatfield and Baskett or others.

79.     Officers Custance, Hatfield and Baskett's conduct was objectively unreasonable, which resulted from their lack of training and comported with the City of Killeen's illegal de facto policies and customs.

80.     As a result of Officers Custance, Hatfield and Baskett's unjustified actions, Reed suffered an injury, which resulted directly and only from the use of force, that was clearly excessive (again, since there was no need at all), and the force used was objectively unreasonable and in violation of clearly established law.

81.     Officers Custance, Hatfield and Baskett's duties and responsibilities during the February 27, 2019 deadly shooting were well defined by applicable law and they knew or reasonably should have known that their conduct was below the standard prescribed by such law.

82.     As a result of the Defendants' violations of the constitutional standards set forth herein, and having been shot at at least twenty-three (23) times and having sustained a bullet wound to right side of his chest, Reed was treated inhumanely and incurred extreme pain and an untimely death.

83.     Based on these constitutional violations and the injuries and other damages sustained, Plaintiff seeks compensation from the Defendants as set forth more specifically in the section of this Complaint entitled "Damages."

**Second Cause of Action**
**The City of Killeen's Failure to Train and Adequately Supervise or**
**Discipline**
**<u>42 U.S.C. § 1983 Violation of the Fourth Amendment</u>**

84.     Plaintiff hereby adopts, incorporates, re-states, and re-alleges paragraphs 1 through 83, inclusive, with regard to all causes of action.

85.     The City of Killeen and the KPD, by and through the Killeen City Council and Chief Kimble, have an inadequate policy of training officers regarding the following areas of law enforcement:

      a.     The use of proper procedures during the execution of a no-knock warrant.

      b.     The use of excessive and/or deadly force.

      c.     The proper use of less deadly means.

      d.     Proper de-escalation techniques.

86.     Defendants and other officers at the scene of the shooting incident were acting under the color of law and acting pursuant to customs, practices and policies of the City of Killeen and the KPD in regards to the use of deadly force as authorized and/or ratified by the Killeen City Council and Chief Kimble.  Reed was deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, by the City of Killeen failing to provide proper training, adequate supervision or discipline in dealing with individuals such as Reed in violation of 42 U.S.C. §1983 and related provisions of federal law and in violation of the above cited constitutional provisions.

87.     The City of Killeen's policy of inadequate and improper training of police officers on proper use of excessive and/or deadly force and no-knock warrant procedures, resulted in the constitutional deprivations and damages alleged herein.

88.     The City of Killeen and the KPD failed to adequately train and failed to adequately supervise or discipline the Defendant Officers, despite their unlawful conduct.  Defendant Custance was only disciplined because an outside agency, the Texas Rangers, determined that he lied and tampered with evidence, and he was allowed to resign.  The finding in the Rangers

investigation that the firearm found near Reed's body was jammed also proves that Defendants Hatfield, Baskett and Suess lied to investigators when they stated that Reed stuck his arm out of his bedroom window and shot at officers two to four times.  Custance also lied that he heard gunshots and saw muzzle flashes coming from Reed's bedroom.

89.     The Defendants lack of training led to the use of excessive and deadly force and, ultimately, their killing of Reed.

90.     The KPD has longstanding records of not providing KPD officers with adequate training on de-escalation techniques intended to prevent instances of excessive and deadly force and extrajudicial killings by Killeen Police officers.  Furthermore, KPD officers have a history of lying during the investigatory process and have in fact caused multiple injuries in previous no-knock raids.

91.     The actual practice or custom of the KPD regarding the use of deadly force is to "shoot first and ask questions later."

92.     As a result of the lack of training and the official custom or policies of the KPD, there have been a number of injuries and at least two fatalities during the execution of no-knock warrant raids.

93.     There exists a persistent, widespread practice of misconduct and/or injuries during no-knock warrants previously documented  that result from the training or lack thereof, received by KPD officers.

94.     After the deadly shooting of Reed, Chief Kimble stated Killeen Police Chief Charles Kimble said Custance's actions violated department policy.  "Killeen Police Department has a very clear code of ethics, and this officer's actions during and after the incident were

unacceptable," Kimble said. "Public trust is paramount to law enforcement, and unethical behavior within the department will not be tolerated."  However, KPD officers have a history of lying to cover up their own misconduct or that of other officers during the course of an investigation.

95.     On June 6, 2016, KPD Officer Micaire Morrisey was fired after it was discovered that he lied to investigators in  criminal and internal investigations that followed the sexual assault accusation against another officer.  Morrisey was terminated for multiple violations of departmental general orders and violation of Local Civil Service Rules and Regulations.   As recently as March 2020, KPD officer Benjamin Harp was been arrested for filing a false police report.  Similar to Defendant Custance, these officers provided statements to investigating officers that were proven false during the course of the investigations.  Due to the fact that the City Council and Chief of Police have failed to make policy changes to correct this issue, KPD officers continue to lie for themselves and other officers during investigations.  The public is only aware of those who are caught lying, held accountable and where it happens to be reported in the media.  Defendants Hatfield, Baskett and Suess also lied during the investigation of Reed's death but were not held accountable.

96.     As noted above, Officers Custance, Hatfield and Baskett used excessive and deadly force for no lawful reason when they shot at and killed Reed.

97.     The evidence does not support the fabricated story told by Officers Custance, Hatfield and Baskett that Reed fired from his bedroom and that he stuck his arm out of his bedroom window and fired two to four shots at officers before they returned fire.

98.     Officers Custance, Hatfield and Baskett's unlawful and unwarranted acts, lack of training, and the official customs or policies of the KPD, caused Reed's wrongful death.

99.     Plaintiff would show that at all times material hereto, Officers Custance, Hatfield, Baskett and Suess were acting individually and/or in the scope of their employment as agents, servants, and employees of the KPD and were performing a governmental function.

100.     Plaintiff would further show that Officers Custance, Hatfield and Baskett's actions were the result of, or within the scope of, wrongful and reckless customs, policies, practices and/or procedures of the KPD, in regard to the use of deadly force for which the Killeen City Council, the City of Killeen and Chief Kimble knew or should have known, but never provided the requisite and proper training.

101.     Moreover, no reasonably competent official would have concluded that the actions of Officers Custance, Hatfield and Baskett described herein would not violate Reed's constitutional rights. In other words, no reasonably prudent police officer under similar circumstances, could have believed that Officers Custance, Hatfield and Baskett 's conduct was justified.

102.     As a direct and proximate result of Defendants' conduct, the Plaintiff has sustained substantial damages and pecuniary loss.

103.     As a direct cause and result of the constitutional violations as set forth herein, Reed incurred extreme pain, injuries and, ultimately, death for which the Plaintiff seeks compensation, as set forth more specifically in the section of this Complaint entitled "Damages."

### Third Cause of Action
### Conspiracy to Deprive Constitutional Rights
### 42 U.S.C. § 1985(3) Conspiracy by
### Defendants Custance, Hatfield, Baskett and Suess

104.     Plaintiff hereby adopts, incorporates, re-states and re-alleges paragraphs 1 through 103, inclusive, with regard to all causes of action.

105.     As described more fully above, each of the Defendants conspired, directly or indirectly, for the purpose of depriving Reed of the Equal Protection of the law.

106.     In so doing, Defendants took actions in furtherance of this conspiracy, causing injury to Reed.

107.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

108.     The misconduct described in this Count was undertaken pursuant to the policy, customs and/or practice of the Killeen Police Department in the manner described more fully in preceding paragraphs.

### Fourth Cause of Action
### Conspiracy to Deprive Constitutional Rights
### 42 U.S.C. § 1983 Conspiracy by All Defendants

109.     Plaintiff hereby adopts, incorporates, re-states and re-alleges paragraphs 1 through 108, inclusive, with regard to all causes of action.

110.     After the Reed murder, the Defendants reached an agreement amongst themselves to cover up their misconduct by telling investigators that Reed shot at them two to four times and caused the injury to Suess before they returned fire, and to thereby deprive Reed of his constitutional rights, all as described in the various paragraphs of this Complaint.

PLAINTIFF'S ORIGINAL COMPLAINT – Page 29

111.    In furtherance of the conspiracy, each of the co-conspirators committed overt acts and were otherwise willful participants in joint activity.

112.    As a direct and proximate result of the illicit prior agreement referenced above, Plaintiff's rights were violated, and he suffered financial damages, as well as severe emotional distress and anguish, as is more fully alleged above.

113.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

114.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the KPD in the manner described more fully in preceding paragraphs and was tacitly ratified by policy-makers for the City of Killeen with final policymaking authority.

## SURVIVAL ACTION

115.     Plaintiff incorporates by reference paragraphs 1 through 114 as if fully set forth herein.

116.    Plaintiff Diane Reed Bright is acting as the Personal Representative for the estate of James Scott Reed.

117.    Reed died as a result of the Defendants' wrongful conduct.

118.    Reed would have been entitled to bring this action against the Defendants if he had lived.

123.    The decedent's right of action for wrongful conduct against the Defendants survives in favor of heirs, legal representatives, and the estate of the deceased.

124.    Defendants are liable to the estate of James Scott Reed for the loss of Reed's life, funeral expenses, pain and suffering, and the violation of his civil rights.  Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled

"Damages."

## WRONGFUL DEATH

125.    Plaintiff incorporates by reference paragraphs 1 through 124 as if fully set forth herein.

126.    By reason of Officers Custance, Hatfield and Baskett's wrongful conduct of killing Reed without the threat of imminent death or serious bodily harm, Defendants are liable to Plaintiff for damages.

127.    Officers Custance, Hatfield and Baskett's conduct caused Reed' death and was a producing cause of his injuries, which resulted in the damages enumerated below.

128.    Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages.

## DAMAGES ALL DEFENDANTS

129.    Plaintiff incorporates by reference paragraphs 1 through 128 as if fully set forth herein.   Defendants' acts and/or omissions were a proximate cause of the following Injuries suffered by Plaintiff:

     a.    Actual damages;

     b.    Loss of affection, consortium, comfort,  financial assistance, protection, affection and care;

     c.    Pain and suffering and mental anguish suffered by Reed prior to his death;

     d.    Mental anguish and emotional distress suffered by Plaintiff;

     e.    Loss of quality of life;

     f.    Funeral and burial expenses;

     g.    Loss of service;

    h.      Loss of value of life;

    i.      Loss of earnings and contributions to Plaintiff;

    j.      Exemplary and punitive damages for Plaintiff;

    k.      Pursuant to 42 U.S.C. §1988, and other applicable laws, Plaintiff should be awarded reasonable attorney's fees for the preparation and trial of this cause of action, and for its appeal, if required;

    l.      Prejudgment interest; and

    m.      Post judgment interest.

130.    Plaintiff seeks unliquidated damages in an amount that is within the jurisdictional limits of the court.

## PUNITIVE AND EXEMPLARY DAMAGES

131.    Plaintiff incorporates by reference paragraphs 1 through 130 as if fully set forth herein.  Additionally, and in the alternative, the conduct of Defendants Custance, Hatfield, Baskett and Suess was done with malice.  As such, Plaintiff requests punitive and exemplary damages to deter this type of conduct in the future.  In the alternative, such heedless and reckless disregard of Reed's rights, safety and welfare is more than momentary thoughtlessness, inadvertence or misjudgment. Such unconscionable conduct goes beyond ordinary negligence, and as such Plaintiff requests that punitive and exemplary damages be awarded against Defendants Custance, Hatfield, Baskett and Suess in a sum which is within the jurisdictional limits of this court.

## COSTS AND ATTORNEY FEES

132.     Plaintiff incorporates by reference paragraphs 1 through 131 as if fully set forth herein.  Plaintiff is entitled to an award of attorney fees and costs under 42 U.S.C. § 1988(b).  As such, Plaintiff requests the Court to award costs and attorney fees incurred in Plaintiff's prosecution of this litigation.

## CONDITIONS PRECEDENT

133.     Plaintiff reserves her right to plead and prove the damages to which they are entitled to at the time of trial.  All conditions to Plaintiff's recovery have been performed or have occurred.

## TRIAL BY JURY

134.     Plaintiff has paid a jury fee and demands a trial by jury.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiff has and recovers a judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; costs of court; and such other and further relief, both general and special, at law and in equity, to which Plaintiff may show she is justly entitled.

Respectfully submitted,


By: /s/ DARYL K. WASHINGTON
     Daryl K. Washington
     State Bar No. 24013714
     WASHINGTON LAW FIRM, PC
     325 N. St. Paul St., Suite 3950
     Dallas, Texas 75201
     214-880-4883
     214-751-6685 - fax
     Email: dwashington@dwashlawfirm.com

     **ATTORNEYS FOR PLAINTIFF**