IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| DIANE REED BRIGHT, INDIVIDUALLY, | § | |
| and as the PERSONAL REPRESENTATIVE | § | |
| FOR THE ESTATE OF DECEDENT, | § | |
| JAMES SCOTT REED | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 6:20-CV-431 |
| | § | |
| THE CITY OF KILLEEN, TEXAS; | § | |
| ANTHONY R. CUSTANCE; RICHARD A. | § | |
| HATFIELD, JR.; FRED L. BASKETT; and | § | |
| CHRISTIAN SUESS, | § | |
| | § | |
| | § | |
| *Defendants.* | § | |

---

**PLAINTIFF'S RESPONSE TO DEFENDANT ANTHONY R. CUSTANCE'S
MOTION TO DISMISS PLAINTIFF'S ORIGINAL COMPLAINT**

---

Plaintiff Diane Reed Bright, individually and as the personal representative for the Estate

of Decedent James Scott Reed, files this Response to Defendant Anthony R. Custance's Motion

to Dismiss (Doc. 20) and respectfully shows the Court as follows:

## I.      SUMMARY OF OPPOSITION

The Plaintiffs bring this lawsuit against Custance in his individual and official capacity.

The factual assertions that Plaintiff has pleaded against Custance are not duplicative to those that

were made against the City of Killeen.  Thus, the Defendant's argument is flawed.

In his motion to dismiss[1], Custance seeks qualified immunity; but he does not argue that

he was justified in using excessive force against Reed at all. Rather, the only reason he urges for

---

[1] Although the motion cites no authority for dismissal under the Federal Rules of Civil Procedure, Bright presumes
Custance files his motion pursuant to Rule 12(b)(6).

dismissing Bright's Fourth Amendment claim against him is his belief that unless he fired the bullet that killed James Scott Reed, he did not cause any constitutional harm. Custance is incorrect.

All four Killeen police officers—including Custance—violated Reed's Fourth Amendment rights when they: (1) executed a no-knock no-announce search warrant on Reed's home even though they had no articulable reason to be concerned that Reed would threaten their safety; (2) violently seized Reed, subjecting him to direct police action without justification having been shot at least twenty-three (23) times and having sustained a bullet wound to right side of his chest; and (3) used lethal force against Reed when the facts do not clearly show he posed them any immediate threat of harm. To begin with, the police action directed toward Reed was excessive force, even if no bullet struck him. Moreover, while Custance now claims Reed had a gun and fired it at officers, it is highly disputed whether: he actually saw or could have seen Reed with a gun; Reed actually fired a gun or did anything threatening; or Custance ever issued a warning before using deadly force. These factual disputes do not entitle Custance to qualified immunity. Likewise, the no-knock no-announce raid itself violated the Fourth Amendment, as Custance had no specific information that Reed posed a safety risk. Manufacturing exigent circumstances in an attempt to justify the unannounced entry and deadly force used against Reed also does not entitle Custance to immunity.

Bright's allegations also show Custance conspired with the other Defendant officers to deprive Bright of her Fourteenth Amendment rights to seek recovery for Reed's Fourth Amendment violations by falsifying their version of what happened on the night they killed Reed in order to claim their no-knock no-announce raid and resulting excessive force were justified. Such a claim against the officers individually is actionable under Section 1983 and Section 1985(3). For this reason, too, dismissal is improper. Thus, Custance's motion should be denied in its entirety. The errors underlying Custance's arguments are manifold.  Alternatively, only if the

Court finds Bright's allegations at all deficient, Bright requests leave to amend her Complaint.

## II.    RELEVANT FACTUAL BACKGROUND

On February 27, 2019, James Scott Reed and his girlfriend Eva Marie Brocks were asleep together in his apartment bedroom when the pre-dawn silence was shattered by the glass of the bedroom window breaking and falling on them in bed, as flashbang grenades erupted beside them, jolting them from their sleep. (Doc. 1 at ¶ 21, 27). Suddenly, Brocks heard pops and rapid gunfire. (*Id.* at ¶ 27). Less than two weeks prior, Reed's apartment had been hit during a drive-by shooting, after which responding Killeen police officers advised Reed to obtain home protection. (*Id.* at ¶ 26). But amid the darkness of the room and the night surrounding the shooters outside, Brocks had no idea that this assault was being perpetrated by the police themselves until after the shooting stopped—especially since it "was only then when she heard someone yell 'police.'"  (*Id.*).

Rather than knock or announce they were police or the purpose of their presence, officers broke in without warning Reed or waiting for his response, alleging as justification that a decade earlier, a taser had to be used to arrest Reed. (*Id.* at ¶ 19). At the time Killeen PD officers obtained a narcotics search warrant for Reed's home, Reed had no criminal record involving gun charges. (*Id.*). And, while police claimed they knew Reed had firearms in his home, Brocks said Reed had only just obtained a small gray gun and a shotgun *after* the drive-by shooting. (*Id.* at ¶ 26). All four defendant officers admit that they shot (or may have shot) at Reed (*Id.* at ¶¶ 25, 35, 39)—yet it only took a single bullet to end Reed's life. (*Id.* at ¶ 22).

The officers have attempted to justify using lethal force by claiming Reed "stuck his arm out of the window and shot at officers with a handgun [two to four times] before they returned fire." (*Id.* at ¶¶ 33, 88). Brocks said otherwise, indicating that "Reed would have not been able to

fire *any* shots as fast a[s] the unannounced shooting commenced." (*Id.* at ¶ 27) (emphasis added). Furthermore, the smoke from the flashbang grenades, "obstructions to the view inside the bedroom window including a curtain or blanket hanging from the window and trees," and the pre-dawn darkness together would have made it difficult to see Reed in the bedroom at all. (*Id.* at ¶ 21). Officers also recall seeing a black gun; Reed's is gray. (*Id.* at ¶ 33). Further, ballistic examination of the gun found in Reed's bedroom shows the magazine in the handgun was still filled to capacity with seven rounds of  ammunition—with one round lodged in the chamber, preventing firing it at all. (*Id.* at ¶¶ 48–49). Indeed, the Ranger's Report does not show any gunshot residue found on Reed. (*Id.* at ¶ 52). This evidence shows the handgun was not—and could not be—fired at officers.

Although Custance later admitted shooting at Reed, he initially denied even being in position to be able to shoot at Reed; and he should not have been, as he was ordered to take a position on the northeast corner of the house to watch for and warn the team about "movement dangers." (*Id.* at ¶ 36). Instead, after hearing Reed's window break on the west side, Custance moved around the north side toward the other Defendant officers, where "Custance claims that he saw muzzle flashes and 'suspected' that they were from someone inside the room shooting toward the window team." (*Id.* at ¶ 37). Custance did *not* say he saw anyone inside holding or firing a gun. (*Id.* at ¶¶ 32, 37).

In September 2019, Custance pleaded guilty to felony tampering with physical evidence when facts showed he lied, concealed and altered evidence during the investigation. (*Id.* at ¶ 45). During the same investigation, Killeen PD did not require officers to give written statements until five and eight days after killing Reed, even after Custance lied about his conduct. (*Id.* at ¶ 33). Bright alleges that, in the end, all four officers conspired to fabricate a story that Reed shot at the officers first, in an attempt to justify their use of force. (*Id.* at ¶ 59).

The Plaintiff has alleged that the individual police officer Defendants, including Custance, were not facing the imminent threat that they claimed in their false statements and violated Reed's Fourth and Fourteenth Amendment Rights to be free from excessive and deadly use of force.  It is clearly established that excessive and deadly force in such cases is objectively unreasonable. *See Cole v. Carson*, 905 F.3d 334, 346 (5th Cir. 2018), *en banc reh'g granted*, 2019 WL 540982 (Feb. 8, 2019); *see also Tennessee v. Garner*, 471 U.S. 1, 2 (1985). Therefore, Custance's motion should be, in all things, denied.

## III.     ARGUMENT & AUTHORITIES

### A.     The pleading standard for a Rule 12(b)(6) motion.

The pleading stage is not the point at which plaintiffs must establish the level of proof necessary to ultimately prevail. *See Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977). Indeed, a "strong framework of policy considerations . . . militate[s] against granting motions to dismiss for failure to state a claim[.]" *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). Thus, in the Fifth Circuit, motions to dismiss "are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 231 (5th Cir. 2009). A complaint will not be dismissed merely because it contains an imperfect statement of the legal theory supporting the claim asserted. *Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014). Federal pleading rules simply call for "a short and plain statement of the claim showing that the pleading is entitled to relief." *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

The ultimate question in a motion to dismiss is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002). Two primary principles guide the plausibility analysis: Courts must "liberally construe the complaint in favor of the plaintiff" and

must "accept all well-pleaded factual allegations as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Importantly, courts do not evaluate the merits of the allegation but only consider whether plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). A pleading simply needs to provide "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements." *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009).

### 2.    The pleading standard applicable to Plaintiffs' excessive force claims.

Despite what Custance urges, the Fifth Circuit has repeatedly clarified that a heightened pleading standard "does not apply to the complaint or to any reply merely because an answer or motion to dismiss asserts a defense of qualified immunity." *Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016) (quoting *Schultea v. Wood*, 47 F.3d 1427 (5th Cir. 1995)). Rather, once a defendant properly invokes qualified immunity, the Court assesses whether Bright's allegations, accepted as true and viewed in the light most favorable to her, "(1) conceivably state violations of clearly established Fourth Amendment rights, and (2) allege conduct that is objectively unreasonable." *Heitschmidt v. City of Hous.*, 161 F.3d 834, 836–37 (5th Cir. 1998); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Since the key concern is whether the officer was on notice that the conduct violated the suspect's constitutional rights, a right is clearly established "despite notable factual distinctions between the precedents relied on and the cases then before the Court." *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008).

### B.    Bright's allegations are more than sufficient to state a claim that Custance violated Reed's Fourth Amendment rights.

#### 1.    Custance's bullet did not need to strike Reed for his use of lethal force directed at Reed to be excessive.

Custance does not attempt to justify his use of excessive force toward Reed; he simply

presumes that, unless he was the officer who fired the bullet that killed Reed, no excessive force against Reed can be attributed to him. Curiously, Custance also criticizes Bright's Complaint as insufficiently identifying which officer shot the fatal bullet (Doc. 20 at ¶ 6), even though Custance initially tried to hide his own involvement in shooting at Reed. (Doc. 1 at ¶ 38).

On the contrary, in *Petta v. Rivera*, the Fifth Circuit explained that a person need only be the direct object of an officer's unconstitutional misconduct to have a Section 1983 claim. *See Petta v. Rivera*, 143 F.3d 895 (5th Cir. 1998) (per curiam). In *Petta*, a police officer pulled over a mother driving with her children in the car who, when ordered out of the car, refused and rolled up her window; then the officer became abusive. *Id.* at 902. The Fifth Circuit held that the officer directed "lethal and other violent force [] toward the Petta vehicle occupied by Ms. Petta and her small children, both before and during the chase"—including "threatening to kill Ms. Petta while aiming his revolver at her, bludgeoning the car's window, attempting forcibly to enter the vehicle, [and] threatening to have it towed with the Pettas inside." *Id.* After she fled the scene, the officer aimed further lethal force at the children when he shot at the Pettas' car.  *Id.*

The officer's violence constituted direct "acts that the children experienced themselves i." *Young v. Green*, No. H–11–1592, 2012 WL 3527040, at *5 (S.D. Tex. Aug. 15, 2012) (citing *Petta*). It was reasonable to infer from such facts that the officer acted with "utter disregard for the safety and well-being" of both the mother and her children. *Petta*, 143 F.3d at 903. Thus, "[a]lthough the Petta children fortuitously escaped physical injury," the children stated a claim for constitutional and psychological injuries caused by police misconduct directed at them. *Id.*

Likewise, here, even if the bullets from a particular officer did not strike Reed, each officer who fired in his direction still subjected Reed to direct police action, in violation of his Fourth Amendment rights. In fact, even officers' assault on his home was a Fourth Amendment "seizure,"

just as passengers in a vehicle are "seized" when a police officer stops the car. *See Lytle v. Bexar Cty.*, Tex., 560 F.3d 404, 410 (5th Cir. 2009). "Accordingly, even if the officers' intended application of force would have only incidentally seized" a person, when the methods of detention terminate the person's freedom of movement, "there is no set of facts that precludes a finding of a Fourth Amendment seizure." *Brower v. Cty. of Inyo,* 489 U.S. 593, 599 (1989); *see also Brendlin v. California*, 551 U.S. 249 (2007). Similarly, because Reed's freedom of movement was terminated by the no-knock no-announce raid, even if the officers' intended force would have only incidentally seized Reed, the raid was a Fourth Amendment seizure which, as explained below, was unjustified.

Yet Custance wrongly suggests that Bright has not pleaded that Custance's own individual actions violated the constitution and that instead Bright only pleads collective allegations against the defendant officers and "does not identify with reasonable specificity the person responsible for the alleged constitutional harm." (Doc. 20 at ¶ 5). On the contrary, Bright alleges that Custance was personally involved in using excessive force against Reed—despite his attempts to lie about his involvement—and independently caused Reed's Fourth Amendment injuries. (*See, e.g.,* Doc. 1 at ¶ 58) ("Custance, Hatfield and Baskett unlawfully shot and killed Reed without any warning, although they were not in imminent danger and when less deadly alternatives were available.") Even if Bright had not specifically identified Custance, "Plaintiff is bound by Rule 11 to allege only those facts for which he has or will likely have evidentiary support. As the Fifth Circuit explained in *Schultea v. Wood*, a plaintiff is not required to plead facts 'peculiarly within the knowledge of defendants.'" *Williams v. City of Denton, Tex.*, No. 4:17-CV-00811, 2019 WL 438403, at *10 (E.D. Tex. Jan. 10, 2019), *report & recommend. adopted*, 2019 WL 430913 (E.D. Tex. Feb. 4, 2019) (quoting *Schultea*, 47 F.3d at 1432 and *Hubert*, 335 F. App'x at 472). Therefore,

to the extent the Complaint is not yet able to identify which officer's bullet killed Reed, "[t]he failure of specificity is no fault of" Bright's, "because [s]he has not yet had the benefit of discovery." *Id.*

The case relied upon by Custance as an example of a failure to plead personal involvement is factually distinguishable from the instance case.  There the plaintiff failed to plead any personal involvement by the named defendants.  *See Thompson v. Steele*, 709 F.2d 381 (5th Cir. 1983) (*pro se* Plaintiff named supervisory defendants who had no personal involvement in the claims).  In the instant case, Custance's personal involvement has been properly plead.

For all these reasons, Bright's allegations are more than sufficient to state a claim against Custance for violating Reed's Fourth Amendment rights.

### 2.     The law was clearly established that Custance's excessive use of lethal force toward Reed was objectively unreasonable at the time of the incident.

It is beyond debate that "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Tennessee v. Garner*, 471 U.S. 1, 2 (1985). Conversely, when allegations do not clearly show an immediate threat of harm, the use of deadly force is objectively unreasonable. *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. Aug. 20, 2019) (reh'g en banc). In *Cole v. Carson*, the Fifth Circuit clarified that "*Garner* also requires a warning before deadly force is used 'where feasible,'" calling such warnings "a critical component of risk assessment and de-escalation" necessary to justify using deadly force. *Id.* at 453. The court emphasized that where officers "had the time and opportunity to give a warning and yet chose to shoot first instead," it was an "obvious case" where "conduct violates clearly established law." *Id.* at 453, 455.

Moreover, courts must not dispose of a deadly force claim when the facts alleged make it

unclear if there was an immediate threat. *See Reyes v. Bridgwater*, 362 F. App'x 403, 409 (5th Cir. 2010) (unpublished) ("[W]as there such an immediate threat? Bridgwater's version of the facts would say 'yes,' while the other witnesses' versions would say 'no.'" Thus, while law was clearly established, facts were not, precluding summary judgment). Particularly at the pleading stage, where the facts pleaded—viewed in the light most favorable to the plaintiff—and reasonable inferences drawn from them plausibly show officers used lethal force at a moment when the person posed no immediate threat of serious harm, dismissing such a claim is improper. *See Giardina v. Lawrence*, 354 Fed. App'x 914, 916 (5th Cir. 2009) (per curiam) (unpublished) (no threat of serious harm established where it was disputed whether a man: (1) appeared to hold a small revolver rather than a cell phone and (2) was ordered to drop the "weapon" but did not comply).

For instance, in *Baker v. Putnal*, the Fifth Circuit held qualified immunity was properly denied where witness testimony suggested that the decedent "may have barely had an opportunity to see [the officer] before [the officer] fired his gun." *Baker*, 75 F.3d 190 (5th Cir. 1996). The plaintiff's facts disputed the officer's claim that the decedent held a pistol, loaded it with ammunition, and pointed at the officer, "thereby justifying deadly force." *Id.* The only undisputed evidence was that "there was a good deal of confusion" on the scene and that the decedent had begun to turn toward the officer. *Id.* These were "not compelling reasons to find that [the officer's] use of force was not excessive as a matter of law." *Id.* at 198.

The Northern District of Texas recently analogized to *Baker* in rejecting qualified immunity where it was disputed whether the decedent "was just turning when Officer shot him, whether he was reaching for a weapon when he was shot, and whether officers warned him." *Hickson v. City of Carrollton*, No. 3:18-CV-02747-B (BH), 2020 WL 3810360, at *6 (N.D. Tex. June 16, 2020), *report & recommend. adopted sub nom*, *Hickson ex rel Estate of Hickson v. City*

*of Carrollton*, No. 3:18-CV-02747-B, 2020 WL 3798856 (N.D. Tex. July 7, 2020). The court pointed to numerous recent cases in which the Fifth Circuit has denied qualified immunity where it was disputed whether: officers actually saw or could have seen the decedent with a gun; the person they shot actually did anything threatening; or officers ever issued a warning before using deadly force. *See id.* (citing *Cole*, 935 F.3d 448-49, 457 ("under the plaintiffs' version of the facts, officers shot their teenage son without warning although he was holding a gun to his head, facing away from the officers and unaware of their presence, and never pointed a gun at them"); *Keeton Geiger v. Sloan*, 780 F. App'x 150, 154-55 (5th Cir. 2019) (disputed facts regarding "whether the officer perceived a threat of imminent harm before using deadly force, including whether he saw or could have seen a gun, and whether he shot because a gun was pointed at him"); *Flores v. Harris*, No. CV H-17-3817, 2019 WL 1426313, at *16–17 (S.D. Tex. Mar. 29, 2019) (slip op.) ("conflicting evidence regarding whether the gun in the plaintiff's waistband was visible to officers, whether the plaintiff reached for, was holding, or pointed the gun before being shot by officers, and whether the officers were in uniform or identified themselves as officers").

As the *Hickson* court reasoned, "In *Cole* the Fifth Circuit expressly recognized that under its prior holding in *Baker*, it was clearly established prior to 2010 that it was unlawful for an officer to shoot a person who was turning towards him when the person made no threatening movements toward the officer, was not warned by the officer despite an opportunity to do so, and may have barely had an opportunity to see the officer before being shot." *Id.* (citing *Cole*, 935 F.3d at 453–54; *Baker*, 75 F.3d at 198 at 198). Likewise in *Hickson*, when told to put his hands in the air, the decedent "stopped and turned to see who was yelling at him, but he 'was shot as soon as he turned'" even though facts, viewed in a light most favorable to plaintiffs, showed he took no threatening action. *Id.* These factual disputes over what happened in the moments leading to his death went to

both (1) whether the "Officer reasonably perceived a threat of imminent harm" and (2) "whether Officer's actions violated a constitutional right that was clearly established at the time of the events in question." *Id.* Thus, on either basis, it was proper to deny qualified immunity.

Here, as in *Baker*, *Cole*, *Hickson*, *Sloan*, and *Flores*, it is hotly disputed whether Custance or the other officers actually saw or could have seen Reed with a gun—and whether Reed actually did anything threatening—and undisputed that officers never warned Reed before using deadly force:

- Brock said "Reed did not shoot at officers. In fact, she indicated that Reed would have not been able to fire any shots as fast at the unannounced shooting commenced" (Doc. 1 at ¶ 27). She also said "the police did not announce themselves before the shots began" (*Id.*);

- Conversely, in their statements not given until five to eight days after the event, the officers all "tell a specific story that the initial gunfire was from Reed using a small arms pistol or handgun and therefore could not have been from Custance's rifle or from Baskett's handgun or another police shooter's handgun" (*Id.* at ¶ 33);

- While Custance initially told supervisors after the raid "that he did not shoot his firearm at the scene," he later "admitted that he did shoot at the back of the Reed residence" and "alleged that he began shooting when he saw muzzle flashes and heard gunfire" (*Id.* at ¶ 32) but did not say he saw the person shooting. Yet somehow, Custance concluded "the person inside of the room was clearly firing a weapon" (*Id.* at ¶ 37);

- Five days after the raid, Hatfield claimed "he heard a 'pop' from a handgun in the direction of Reed's bedroom window" then "observed a right hand and arm holding a 'black' in color handgun coming out of the bedroom window" pointed at Baskett and Suess (*Id.* at ¶ 34). Further, Hatfield claims "he heard the person inside the residence that was holding the handgun outside the window continue to fire" two to three more times (*Id.*) before backing into the bedroom (*Id.* at ¶ 35);

- Eight days after the raid, Baskett said "he saw a gun come out of bedroom window and heard approximately two to three shots fired 'from the suspects handgun.' Baskett alleges that he then drew his department issued handgun and began to shoot at Reed who was still holding a gun and pointing it out of the window" (*Id.* at ¶ 39);

- Also eight days later, Suess said he saw "a black arm holding a handgun come out of the bedroom window" and that "the handgun fired two times in a fast manner." (*Id.* at ¶ 40). Then, he said he saw Baskett fire his gun at Reed but Suess "did not fire at Reed since he was unable to see the subject and did not want to shoot wildly into the residence." (*Id.*).

And, considering the view inside the bedroom window was obstructed by smoke from the

flashbang grenades, a curtain or blanket hanging from the window, and trees (*Id.* at ¶ 22), these allegations suggest Custance or other officers may not have even been able to see Reed with a gun. Moreover, ballistic, and forensic evidence suggests the gun Reed had was not—and could not be— fired in its condition most certainly not two to four times. (*Id.* at ¶¶ 48–49).

Therefore, like in *Hickson*, these factual disputes over what happened in the moments leading to Reed's death go to the heart of both (1) whether Custance reasonably perceived a threat of imminent harm and (2) whether Custance's actions violated a constitutional right that was clearly established at the time he shot. Thus, Custance is not entitled to qualified immunity.

### 3.   Officers cannot manufacture a no-knock no-announce night-time raid—itself a Fourth Amendment violation—as a way to justify lethal force against Reed.

Even more troubling than the above cases, here Custance and the officers arrived and immediately began breaking into and firing weapons into Reed's bedroom in the middle of the night while he was asleep with his girlfriend next to him. (Doc. 1 at ¶ 19). In fact, the raid was at least as violent as the drive-by shooting of Reed's apartment he endured less than two weeks earlier, a fact known to the Killeen PD. (*See id.* at ¶¶ 17–18). Indeed, it was the Killeen PD's own recommendation that Reed obtain home protection after the drive-by shooting that prompted Reed to obtain a gun in the first place. (*Id.* at ¶ 26). Officers could hardly be surprised if Reed responded to their surprise attack as he would have responded to a civilian threatening violence again.[3]

Similarly, in *Bishop v. Arcuri*, the Fifth Circuit found a Fourth Amendment violation where

---

[3] Bright does not concede that Reed ever responded to the Officers' violence with violence. But if Reed had used a gun against someone forcibly entering his bedroom, breaking glass where he and his girlfriend slept, and assaulting them with a flashbang grenade in the middle of the night, Texas' Castle Doctrine likely would have provided him a defense. The statute expressly provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary"—a belief "presumed to be reasonable if the actor knew or had reason to believe that the person against whom the force was used unlawfully and with force entered, or was attempting to enter unlawfully and with force, the actor's occupied habitation." Tex. Penal Code § 9.31(a)(1)(A). Thus, officers could hardly be surprised if Reed had defended against a break-in by shooting.

an officer failed to knock-and-announce his identity and purpose before forcibly entering a home to execute a search warrant for drugs based on information from a confidential informant that drugs were being made and sold there. *Bishop v. Arcuri*, 674 F.3d 456, 456 n.6 (5th Cir. 2012). The officer argued the no-knock entry was justified on evidence-destruction grounds and by "his reasonable suspicion that announcing their presence would have put them in danger." *Id.* at 463–64.

Explaining that "[t]he Fourth Amendment incorporates the common-law principle that officers must knock and announce their identity and purpose before attempting forcible entry of a dwelling," the court rejected both of the officer's justifications. *Id.* at 461 (citing *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995)). First, police fears that announcing will prompt evidence destruction do not justify no-knock entry, as "the appropriate constitutional inquiry is how long they must wait to enter after they have announced, not whether they should announce at all." *Id.* at 463. (relying on *U.S. v. Banks*, 540 U.S. 31 (2003). Second, offers must articulate specific facts showing why the plaintiff poses safety concerns if the officer were to knock and announce his identity and purpose. *Id.* at 466. After all, "in the no-knock analysis, the relevant safety concerns typically arise from the entry itself." *Bishop*, 674 F.3d at 456 n.6. Accordingly, the court held that the no-knock entry violated the Fourth Amendment, and that the rights violated by the officers were clearly established at the time. *Id.* Thus the officers were not entitled to qualified immunity.

Again, in a case very similar to this one, the Fifth Circuit in *United States v. Cantu* held officers' night-time no-knock no-announce raid violated the Fourth Amendment. There, "officers approached Mr. Cantu's home in the middle of the night and immediately began prying open his door" while he, his wife, and children were asleep inside—without first knowing that Cantu was "armed or posed immediate danger." *United States v. Cantu*, 230 F.3d 148, 152–53 (5th Cir. 2000).

But *Id.* The court declared: "Such law enforcement practices are clearly unacceptable." *Id.*

The court declared "exigent circumstances created by the police will not justify an unannounced entry into a home." *Id.* at 153 n.1. Officers argued that the movement inside the home justified entering unannounced. *Id.* The court disagreed, reasoning that the movement "could reasonably be attributed to the initial attempt to physically pry open the door." *Id.* "Such 'manufactured exigent circumstances' do not form an adequate basis for dispensing with the announcement requirement, especially when the initial attempt itself is unreasonable." *Id.* Furthermore, the reasonableness of the officer's decision must be evaluated "as of the time [he] entered the [dwelling]." *Richards v. Wisconsin*, 520 U.S. 385, 395 (1997).

In examining what constitutes the "manufactured exigent circumstances" *Cantu* declared would not justify a no-announce entry, the Fifth Circuit in *Linbrugger v. Abercia* illustrated a distinction. *Linbrugger v. Abercia*, 363 F.3d 537, 542 (5th Cir. 2004). Unlike the unreasonable "forcible burglar-like entry in the middle of the night" in *Cantu*, the mental health officers in *Linbrugger* "did not attempt to enter [the] apartment in an unreasonable fashion" or otherwise "create an atmosphere calculated to inflame Linbrugger and excuse a forcible entry." *Id.* at 543–44. And the target of the warrant in *Linbrugger* "had recently threatened to kill his sister" and "intentionally simulated the sound of a shotgun being primed to make the officers believe he was armed" when they arrived. *Bishop*, 674 F.3d at 464 (citing *Linbrugger*, 363 F.3d at 543).

Like the officers in *Cantu* and *Bishop*, Custance cannot rely on what he claims Reed did in response to the raid in order to justify entering his home in the first place; the initial attempt itself was unreasonable. A narcotics warrant does not create any exigency justifying forcible entry without first knocking, announcing, and waiting to assess the need to enter forcibly at all. Nor does alleging that a taser had to be used against Reed during an arrest a decade earlier constitute specific

facts showing Reed posed officers an immediate danger ten years later. In fact, Reed's record did not contain any gun charges that could reliably suggest he would be armed and, unlike the suspect in *Linbrugger*, Reed made no threats of violence toward anyone warranting police intervention and did not threaten officers in any way before they forcibly broke into his home. (*See* Doc. 1 at ¶ 19).

As is "typical," the relevant safety concerns in this case arose from the entry itself. Indeed, as in *Cantu*, movements officers say they saw at the window can reasonably be attributed to the officers' breaking Reed's bedroom window and launching a flashbang grenade next to where they slept. "Such law enforcement practices are clearly unacceptable." *Cantu*, 230 F.3d at 153. Because it was clearly established that the initial forcible entry into Reed's home was unconstitutional, even if Reed defended his home with a weapon, such officer-manufactured "exigent circumstances" do not justify further Fourth Amendment violations. *Id.* at 153 n.1.

Accordingly, the no-knock no-announce night-time raid of Reed's home itself violated Reed's Fourth Amendment rights and resulted in the excessive lethal force that killed Reed.

## C.     Bright alleges sufficient facts to state conspiracy claims against Custance and the officers under Sections 1983 and 1985(3).

Bright has alleged a claim against Custance under 42 U.S.C. Sections 1983 and Section 1985(3) for conspiring with the other officers to cover up and falsify information about events of the no-knock no-announce raid, in order to deprive Bright of her Fourteenth Amendment right to recover for Reed's constitutional injuries and his wrongful death. *See* 42 U.S.C. §§ 1983, 1985(3). Specifically, Bright alleges that Custance, Hatfield, Baskett, and Suess conspired:

- "to cover up their excessive and deadly acts" (Doc. 1 ¶¶ 3, 16);

- to "cover up for the failures to follow protocol and policy by all of the Defendants" and "us[ing] that information to tell a specific story that the initial gunfire was from Reed using a small arms pistol or handgun and therefore could not have been from Custance's rifle or

from Baskett's handgun or another police shooter's handgun" (*Id.* at ¶ 33);

- when "all four Defendant officers lied about the shooting in an effort to cover up their failures to act in an objectively reasonable manner" (*Id.* at ¶ 57);

- by Hatfield, Baskett, and Suess "fabricat[ing] a story that Reed stuck his arm out of the window and shot at them first" while "Custance lied and tampered with evidence" "[i]n an attempt to justify their unprovoked use of deadly force"  (*Id.* at ¶ 59); and

- "reach[ing] an agreement amongst themselves to cover up their misconduct by telling investigators that Reed shot at them two to four times and caused the injury to Suess before they returned fire, and to thereby deprive Reed of his constitutional rights, all as described in the various paragraphs of this Complaint" (*Id.* at ¶  110; *see also Id.* at ¶ 104).

Bright also alleges that the officers waited five to eight days to present their statements, giving them time to communicate and coordinate their fabricated stories. (*See id.* at ¶¶ 33–34, 36, 39–40).

 "The right to sue and defend in the courts is the alternative of force" and "[e]quality of treatment in this respect . . . is granted and protected by the Federal Constitution." *Chambers v. Baltimore & Ohio R.R.*, 207 U.S. 142, 148 (1907) (citations omitted). The Fifth Circuit has "recognized a right of access to the courts," founded in the "Fourteenth Amendment Due Process Clause[]," among others. *Waller v. Hanlon*, 922 F.3d 590, 601 (5th Cir. 2019). "Interference with the right of access to the courts gives rise to a claim for relief under [S]ection 1983" or Section 1985—including "for conspiracy . . . the legal mechanism through which to impose liability on each and all of the Defendants without regard to the person doing the particular act." *Ryland v. Shapiro*, 708 F.2d 967, 972, 974 (5th Cir. 1983).

In *Ryland*, the plaintiffs' Section 1983 claim alleged that by hindering the investigation of their daughter's murder, state agents "interfered with their exercise of their constitutionally protected right to institute a wrongful death suit." *Id.* at 974. "In essence, the allegations in the complaint may be characterized as wrongful interference by the defendants with the Rylands' access to the courts. Alternatively, the actions of the defendants can be analyzed as a conspiracy to obstruct justice." *Id.* at 973. The court stated that "if state officers conspire . . . in such a way as

to defeat or prejudice a litigant's rights in state court, that would amount to a denial of equal protection of the laws by persons acting under color of state law." *Id.* at 974.

Applying those principles, the Fifth Circuit held it was error to dismiss the complaint. First, "any interference with a substantive constitutional right, such as the right of access to the courts, may by itself amount to a constitutional deprivation." *Id.* at 975.  Second, a factfinder could conclude defendants actually carried out the "conspiracy to obstruct justice and/or deny" plaintiffs' constitutional rights from allegations that defendants succeeded in covering up the murder for almost a year. *Id.* at 974–75. Third, the cover-up could have prejudiced plaintiffs' chances of recovery by threatening available evidence due to the delay and "could well prove more expensive to litigate." *Id.* at 975. Finally, the court "reject[ed] the argument by the defendants that they are not liable because they did not intend to harm the Rylands by their actions. It is well settled that there is no requirement of specific intent in actions under section 1983." *Id.*

Here, Bright has alleged that Custance and the other officers conspired in such a way as to defeat or prejudice her rights to recover in state court for Reed's constitutional violations. By conspiring to fabricate their stories and hindering the investigation of the raid that Bright claims resulted in Reed's wrongful death, Bright alleges, the officers attempt to interfere with substantive constitutional rights under the Fourteenth Amendment by justifying their use of deadly force that forms the basis of her civil rights claims against them. From Bright's allegations, a factfinder could conclude that, like the defendants in *Ryland*, Custance and the other officers actually carried out the conspiracy to obstruct justice or deny Bright's right of access to the courts, amounting to a denial of equal protection of the laws by persons acting under color of state law. Such interference with Bright's substantive constitutional rights, by itself, amounts to a constitutional deprivation. Furthermore, like in *Ryland*, the conspiracy could hurt Bright's chances of recovery by

endangering the availability of evidence and could well make her case more expensive to litigate. Thus, Bright has sufficiently alleged a conspiracy claim against Custance under Section 1983.

To state a claim under Section 1985(3), Bright must allege: "(1) a conspiracy involving two or more persons; (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) which causes injury to a person or property, or a deprivation of any right or privilege" of a United States citizen. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 410 (5th Cir. 2020); *see also* 42 U.S.C. § 1983. The Fifth Circuit in *Abbott* found no Section 1985(3) conspiracy in the claim that when Attorney General Paxton "worked in concert with employees" to issue an open letter stating that fear of contracting COVID-19, without a qualifying disability, does not qualify a person to vote by mail, the open letter constituted "voter intimidation, an act in furtherance of a conspiracy to deny the plaintiffs' civil rights." *Id.* at 395. First, the court held that simply "communicating truthfully about Texas law" did not deprive anyone of the equal protection of the laws. *Id.* Second, the Attorney General, presumably acting as the state of Texas, could not conspire with state employees. *Id.* (citing *Hilliard v. Ferguson*, 30 F.3d 649, 652–53 (5th Cir. 1994) ("school board and its employees constitute a single legal entity which is incapable of conspiring with itself").

"Under this principle—sometimes called the intracorporate-conspiracy doctrine—an agreement between or among agents of the same legal entity, when the agents act *in their official capacities*, is not an unlawful conspiracy," where acts of officials of the same agency "are attributed to their principal." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867–69 (2017) (emphasis added). The Supreme Court in *Ziglar* noted that it has not applied the doctrine to Section 1985(3) but was concerned for policy reasons that subjecting officials' communications to conspiracy claims would "chill the interchange and discourse that is necessary for" developing governmental policies. *Id.*

None of the concerns the court expressed in *Abbot* or *Ziglar* are implicated by Bright's claim of conspiracy under Section 1985(3). First, far from merely "communicating truthfully," Bright alleges Custance and the other officers lied about what happened in the raid to protect themselves from liability for violating Reed's Fourth Amendment rights And second, Bright sued Custance and the other officers for conspiracy in their individual capacities—conduct that their employer the City of Killeen should certainly not sanction officially. Given that *respondeat superior* will not support civil rights claims under Section 1983,[4] the officers' misconduct in their individual capacities is further distinct from the acts of defendants attributed to their principal when in their official capacities. Unlike communications between an agency employer and employees, the conspiracy here occurred between employees. And because none of the officers are policymakers, there is no danger that subjecting them to civil liability for their conspiracy would chill communications necessary for developing governmental policies. *See Ziglar,* 137 S. Ct. at 1868–69.

On the contrary, the conspiracy allegations here satisfy every element of a Section 1985(3) claim. First, the conspiracy four persons—officers Custance, Hatfield, Baskett, and Suess. Second, the conspiracy was for the purpose of depriving Bright of equal protection under the laws, preventing her right of access to the courts. Third, Bright alleges that each officer act in furtherance of the conspiracy by falsifying their stories an attempt to justify using deadly force. And fourth, the conspiracy has deprived Bright of her right of access to courts under the laws of the United States, hurting her chances of recovery by endangering the availability of evidence and making her case more expensive to litigate. If believed, the false story achieved by the conspiracy would

---

[4] "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Svcs. of City of New York*, 436 U.S. 658, 691 (1978). Thus, although Bright also sued the officers in their official capacities, the conspiracy claims urged against them in their individual capacities should be considered independently.

foreclose her claim that their killing of Reed was excessive force that violated his Fourth Amendment rights.

Therefore, whether under Section 1983 or Section 1985(3), Bright's allegations are sufficient to state a conspiracy claim against Custance.

**D.      In the alternative, and only if this Court finds Plaintiff's claims deficient in any respect, Plaintiffs seek leave to amend their Complaint.**

As noted in detail above, Bright believes she has adequately pled sufficient claims against Officer Custance and, thus, Custance's motion should be denied. But if the Court believes allegations are deficient in some respect, Bright respectfully asks for leave to amend her Complaint.

"[L]eave to amend shall be freely given when justice so requires, and should be granted absent some justification for refusal." *U.S. ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 386 (5th Cir. 2003) (citing Fed. R. Civ. P. 15(a)). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis,* 371 U.S. 178, 182 (1962). Thus, leave should be given unless the following factors weigh heavily against amendment: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failures to cure deficiencies by prior amendment; (4) undue prejudice to the opposing party; and (5) the futility of the amendment. *See U.S. ex rel. Hebert v. Dizney,* 295 Fed. Appx. 717, 724 (5th Cir. 2008).

Here, none of these factors are present. Accordingly, if Bright's allegations are deficient in some respect, she asks that she be granted leave to amend her Complaint.

## IV.    PRAYER

For these reasons, Plaintiff Diane Reed Bright, individually as the surviving mother of James Scott Reed, deceased, and as the personal representative for the Estate of Decedent James Scott Reed, respectfully asks that this Court deny Defendant Anthony R. Custance's Motion to Dismiss (Doc. 20) in its entirety. Plaintiff further respectfully seeks all other relief to which she may be entitled.

Respectfully submitted,

By: */s/ Daryl K. Washington*

**Daryl K. Washington**
State Bar No. 24013714
dwashington@dwashlawfirm.com
**WASHINGTON LAW FIRM, PC**
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
Telephone: (214) 880-4883
Facsimile:   (214) 751-6685

**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on **July 24, 2020**, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case filing ("ECF") system of the Court. All counsel of record were served via electronic service through the ECF system.

| | |
|---|---|
| **Charles D. Olson** | **Roy L. Barrett** |
| colson@haleyolson.com | barrett@namanhowell.com |
| **Michael W. Dixon** | **Joe Rivera** |
| mdixon@haleyolson.com | jrivera@namanhowell.com |
| HALEY & OLSON, P.C. | NAMAN, HOWELL, SMITH & LEE, PLLC |
| 100 N. Ritchie Road, Suite 200 | 400 Austin Avenue, Suite 800 |
| Waco, Texas 76712 | P.O. Box 1470 |
| *Attorneys for Defendant* | Waco, Texas 76703-1470 |
| *Anthony R. Custance* | *Attorneys for Defendant the City of Killeen,* |
| | *Texas, Richard A. Hatfield, Jr., Fred L.* |
| | *Baskett, and Christian Suess* |

*/s/  Daryl K. Washington*
**Daryl K. Washington**