IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| DIANE REED BRIGHT, INDIVIDUALLY, | § | |
| and as the PERSONAL REPRESENTATIVE | § | |
| FOR THE ESTATE OF DECEDENT, | § | |
| JAMES SCOTT REED | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 6:20-CV-431 |
| | § | |
| THE CITY OF KILLEEN, TEXAS; | § | |
| ANTHONY R. CUSTANCE; RICHARD A. | § | |
| HATFIELD, JR.; FRED L. BASKETT; and | § | |
| CHRISTIAN SUESS, | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS RICHARD A. HATFIELD, FRED L. BASKETT, AND CHRISTIAN SUESS'S 12(b)(6) MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

---

Plaintiff Diane Reed Bright, individually and as the personal representative for the Estate of Decedent James Scott Reed, files this Response to the Rule 12(b)(6) Motion to Dismiss (Doc. 22) filed by Defendants Richard A. Hatfield ("Hatfield"), Fred L. Baskett ("Baskett"), and Christian Suess ("Suess") (the "Defendant Officers") and respectfully shows the Court as follows:

## I.    SUMMARY OF OPPOSITION

The Plaintiff brings this lawsuit against the Defendant Officers in their individual and official capacity. The primary argument for the Defendant Officers' motion to dismiss is that Bright's own allegations show that officers saw James Scott Reed with a gun and that Reed fired at officers, justifying their use of lethal force during the no-knock no-announce night-time raid of Reed's apartment. Further, the Defendant Officers claim that only the officer who fired the bullet that killed Reed could have caused his constitutional harm. Based on these premises, the Defendant

Officers argue they are entitled to qualified immunity for violating Reed's Fourth Amendment right. But both premises are incorrect and contrary to the law.

First, in order to claim that Reed had a gun and fired it at officers, the Defendant Officers rely on blatant misrepresentations of what Bright alleges in her Complaint. They contend that Bright herself alleges that Reed shot at officers, contorting what the Complaint says, the Ranger's Report, DNA evidence, gunshot residue, ballistics evidence, and the officers' own statements actually say, as support for claiming they were justified in using lethal force. On the contrary, Bright's allegations are that Reed never fired his gun that night—which the Ranger's Report, the DNA evidence, gunshot residue testing, and ballistics evidence all support. In addition, Reed's girlfriend said Reed never actually fired a gun that night (and he did not have time to, as officers opened fire almost immediately after breaking in) and says the men who broke in never even announced they were police—let alone issued any warning—until after shooting and killing Reed. The only remaining allegation on which the Defendant Officers rely—their own, self-serving statements—are insufficient to overcome all the other facts showing a dispute as to whether Reed posed any imminent threat of harm to officers. These factual disputes do not entitle the Defendant Officers to qualified immunity.

Second, all four Defendant Killeen police officers—including Custance—violated Reed's Fourth Amendment rights when they: (1) executed a no-knock no-announce search warrant on Reed's home even though they had no articulable reason to be concerned that Reed would threaten their safety; (2) violently seized Reed, subjecting him to direct police action without justification; and (3) used lethal force against Reed when the facts do not clearly show he posed them any immediate threat of harm. The police action directed toward Reed was excessive force, even if no bullet struck him. Moreover, the no-knock no-announce raid itself violated the Fourth Amendment,

as the Defendant Officers had no specific information that Reed posed a safety risk. Manufacturing exigent circumstances in an attempt to justify the unannounced entry and deadly force used against Reed also does not entitle the Defendant Officers to immunity.

Bright's allegations also show the Defendant Officers conspired to deprive Bright of her Fourteenth Amendment rights to seek recovery for Reed's Fourth Amendment violations by agreeing to falsify their version of what happened on the night they killed Reed, in order to claim their no-knock no-announce raid and resulting excessive force were justified. Such a claim against the officers individually is actionable under Section 1983 and Section 1985(3). For this reason, too, dismissal is improper. Thus, Defendant Officers' motion to dismiss should be denied in its entirety. Alternatively, only if the Court finds Bright's allegations at all deficient, Bright requests leave to amend her Complaint.

## II.      RELEVANT FACTUAL BACKGROUND AND DISPUTED FACTS

Bright incorporates by reference the "Relevant Factual Background" in her Response to Custance's Motion to Dismiss (Doc. 24, at 3–4). But because the Defendant Officers misrepresent what Bright actually alleges in her Complaint, Bright disputes the following relevant facts, in addition to the disputes highlighted in the Response to Custance's Motion.

The Defendant Officers contort Bright's version of the events, as well as evidence from the Ranger's Report, DNA testing results, and forensic gunshot residue evidence, pointing to:

- Incorrect contentions regarding the Defendant Officers' statements:
  - "By Plaintiff's own pleadings, . . . Reed reached out the window and fired a pistol at the officers" (Doc. 22 at 3) (citing Doc. 1 at ¶ 35);
  - Bright's account of the officers' statements "confirm[s] that each saw an arm reach out of a window of the apartment with a gun, and that each saw and/or heard the gun fire" (*Id.* at 5) (citing Doc. 1 ¶¶ 34–36, 38–41);
  - "[A]ccording to Plaintiff's own pleadings, Officer Hatfield, Baskett, and Suess each saw an arm extend out of the window with a gun" (*Id.* at 7);
  - "[P]er Plaintiff's own pleadings Reed was shot during the execution of a search

warrant after officers saw him hold his arm out of a window with a gun and after Reed fired at least one shot at the officers" (*Id.* at 8); and

    o   "[P]er Plaintiff's own allegations, Reed pointed a gun at the officers and shot at them at least one time" (*Id.* at 12);

- DNA testing of the gun, which Defendants claim "confirm[s] Reed was holding it" when police shot at Reed (*Id.* at 12, 5) (citing to Doc. 1 ¶¶ 48, 51—52); and

- Gunshot residue testing, which Defendants claim Bright says "showed Reed had residue on his hand consistent with having recently shot a gun" (*Id.* at 5) (citing to Doc. 1 ¶¶ 48, 51–52).

Their motion relies on these misrepresented facts, saying they show Reed fired the gun at least once and "demonstrates that reasonable officers in the Killeen officers' position would have perceived Reed to be threat to their lives justifying the use of deadly force, or at least show that" Bright has not alleged enough facts to state a plausible excessive force claim. (*Id.* at 7). Bright disputes these facts, as each of them contradicts or contorts what Bright says in her Complaint, portraying them as her own "allegations."

      First, Bright's Complaint never says that Reed ever reached out the window, or that he fired a gun that night (let alone at the officers), or that any of the Defendant Officers actually saw or heard gunfire coming from Reed's bedroom. Rather, Bright's Complaint states that the officers *claim* or *allege* they saw these things. For instance, Bright says: "Hatfield alleges that he heard a 'pop' from a handgun . . . . then claims to have observed a right hand and arm holding a 'black' in color handgun coming out of the bedroom window . . . [and] alleges that he heard . . . the handgun outside the window continue to fire approximately two to three more times." (Doc. 1 ¶ 34). Then Bright says "Baskett also alleges that he saw a gun come out of bedroom window and heard approximately two to three shots fired 'from the suspects handgun.'" (*Id.* ¶ 39). And Bright says "Suess also claims to have observed a black arm holding a handgun come out of the bedroom window. Suess alleges that the handgun fired two times in a fast manner and that he then observed Baskett fire his gun at Reed in response." (*Id.* ¶ 40). Finally, "Custance claimed someone was

shooting from the bedroom but he did not describe how other than that he saw muzzle flashes and heard gunfire." (*Id.* ¶ 41). Furthermore, far from supporting the Defendant Officers' story, Bright alleges Reed's girlfriend Brocks said Reed did not fire the gun and, in fact, that officers shot so immediately after breaking in unannounced that Reed "would not have been able to fire any shots." (*Id.* ¶ 27).

Second, while Bright explained that DNA testing showed Reed had held the gun at some point (*Id.* ¶51), nowhere does the Complaint say that DNA testing suggests Reed was holding the gun on the night Defendant Officers broke into his apartment. Considering Reed only obtained the gun within the two weeks prior to Defendant Officers' lethal attack, he would necessarily have held it recently. But none of the allegations demonstrate he held it that night.

Third, Bright's Complaint expressly says that no gunshot residue testing ever showed that Reed had fired the gun at all that day. (*Id.* ¶¶ 52–53). Further, though Reed's gun was a small, gray pistol that fired .380 caliber ammunition, "[t]here were no fired .380 brass cartridges located at the scene" to indicate Reed had fired any bullets from his gun that night. (*Id.* ¶ 50).

Therefore, none of this evidence supports the Defendant Officers' position that Reed fired at them and, at a minimum, makes plain that all of these facts crucial to the qualified immunity inquiry are hotly disputed here.

### III.      ARGUMENT & AUTHORITIES

**A.      The pleading standard for a Rule 12(b)(6) motion.**

Because the same pleading standards and qualified immunity standards that apply to Custance's Motion to Dismiss (Doc. 20) apply to the Defendant Officers' motion to dismiss, Bright incorporates by reference her articulation of the pleading standards in her Response to Custance's Motion to Dismiss (Doc. 24, at 5–6).

**B.      Bright's allegations are more than sufficient to state a claim that the Defendant Officers violated Reed's Fourth Amendment rights.**

> **1.      The Defendant Officers' self-serving statements are insufficient to overcome all the other facts showing a dispute as to whether Reed posed any imminent threat of harm to officers.**

The Defendant Officers' argument that reasonable officers in their position would have seen Reed as a threat to their lives, thereby justifying deadly force, depends entirely on claiming that Bright's Complaint agrees Reed fired his gun at officers—a claim that relies on misrepresenting what Bright alleges. Specifically, they contend that:

> according to Plaintiff's own pleadings, Officer Hatfield, Baskett, and Suess each saw an arm extend out of the window with a gun. Per these officers' statements, the Rangers report (which recounts that the .380 was recovered from Reed's bedroom beside him), and DNA testing (the content of the statements, report and testing all being recounted in the complaint), Reed was holding the gun. Per the officers' statements, the GSR [gunshot residue] testing and the stovepipe jam (all of which are recounted in the complaint), Reed fired the gun at least once.

(Doc. 22 at 7). Incredibly, they declare their story of what happened to be the only "logical conclusion," while Bright's explanation of what the evidence shows happened is unreasonable and that it is "remarkabl[e]" of her to allege Reed did not fire a gun at officers.  (Doc. 22 at 5).

In the Fifth Circuit, "[a]ny credibility determination made between the officers' and [eyewitness's] version of events is inappropriate for summary judgment," let alone dismissal on the pleadings. *Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005).  This is consistent with

the principle announced by the Supreme Court that "[w]hether a person's actions have risen to a level warranting deadly force is a question of fact best reserved for a jury." *Scott v. Harris*, 550 U.S. 372, 395 (2007).  As the *Lytle* Court explained, because "there are few, if any, bright lines for judging a police officer's use of force," it is a question for the community, not the courts:

> [R]easonableness under the Fourth Amendment should frequently remain a question for the jury.  To put the matter more directly, since we lack a clearly defined rule for declaring when conduct is unreasonable in a specific context, we rely on the consensus required by a jury decision to help ensure that the ultimate legal judgment of "reasonableness" is itself reasonable and widely shared.

*Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 411 (5th Cir. 2009).

The Fifth Circuit recently clarified that an officer's "alternative set of facts" in opposition to an excessive force claim cannot control over the plaintiff's facts, such as those alleged in the complaint. *Cole v. Carson*, 935 F.3d 444, 455–56 (5th Cir. Aug. 20, 2019) (reh'g en banc).  There, the court considered whether the facts supported summary judgment based on the officers' qualified immunity defense. *Id.* The court explained that, "'if an excessive force claim turns on which of two conflicting stories best captures what happened on the street,' the caselaw 'will not permit summary judgment in favor of the defendant official. . . . [A] trial must be had.'" *Id.* (quoting *Tolan v. Cotton*, 572 U.S. 650, 660 (2014) (per curiam)). After all, "the officers will have a chance to present their factual narrative—and to question the [plaintiffs']—at trial." *Id.* at 456.

Despite asking the Court to make a credibility determination between the officers' version of events and Bright's—the province of the jury—the motion's conclusion is not the only "logical" one, as numerous other interpretations are at least as reasonable. Bright says the Ranger Report shows that Reed's gun was near his body in the bedroom (Doc. 1 ¶ 33) but not that it was near the window where officers claim shots were fired. Although Bright agrees DNA evidence shows Reed held gun at some point (*Id.* ¶ 51), this does not suggest Reed held the gun that night. Because there was no testing that showed gunshot residue was found on Reed (*Id.* ¶ 52), such forensic evidence

does not suggest Reed fired a gun that night. And, while it is possible to have a round in the chamber with a full magazine, the facts that the magazine of Reed's .380 gun was full, no other .380 cartridges were found on the scene, and the chamber was jammed indicates Reed could not have fired any shots, let alone the *two to four shots* officers claim. (*Id.* ¶¶ 49–50).

The Defendant Officers outright dismiss Bright's claim that Reed's gun could not have fired any bullets that night, as it was found with one cartridge lodged in the chamber, a failure-to-eject malfunction called a "stovepipe" that prevents the gun from firing in that condition. (Doc. 1 ¶¶ 47–48). The Defendant Officers presume that the stovepipe had to have happened when Reed fired at officers, declaring it "fantastic" to infer that "Reed, a man who needed a gun to protect himself, shot his gun at some point in the hours or days prior to the execution of the warrant, the gun jammed, and Reed chose to leave the gun that way." (Doc. 22 at 6). But Reed is the same person who did not have a gun for home protection until he acted on Killeen police officers' advice to obtain one for home protection after Reed endured a drive-by shooting at his home less than two weeks prior to the events giving rise to this case. (Doc. 1 ¶ 26). It is no less "fantastic" to believe that as a new firearm owner, Reed attempted to practice shooting his new handgun and, when his gun jammed, he did not know how to clear the jam in his particular gun. Having recently been shot at, Reed could have had reasonable concerns about trying to clear the jam on his own. That a new gun owner is inexperienced in troubleshooting a malfunction in his particular new weapon and has concerns in figuring out how to resolve the jam without help or professional training, as the Defendant Officers claim to have, is far from "fantastic." Such inferences are reasonable and entirely warranted from the evidence.

Given that the Ranger Report, the DNA evidence, the gunshot residue testing, and the stovepipe jam do not show Reed posed any immediate, serious threat to the Defendant Officers,

they are left to urge that *"from the officer[s'] perspective*, Reed presented an immediate danger justifying the use of deadly force." (Doc. 22 at 5) (emphasis added). While it is understandable the officers would allege this, it is insufficient to overcome the facts supporting otherwise and reasonable inferences drawn from them. Furthermore, viewing Bright to allege the Defendant Officers' statements as facts not only contradicts with what she actually alleges but improperly credits the Defendants' statements over Bright's allegations. To the extent the Defendant officers ask this Court to make a credibility determination, their request is misguided.

Far from demonstrating that reasonable officers would have used deadly force against Reed, at a minimum these facts—viewed in the light most favorable to Bright, as the Court must— and reasonable inferences drawn from them plausibly show the Defendant Officers fired at Reed under circumstances that "do not clearly show an immediate threat of harm" posed by Reed. *Cole*, 935 F.3d at 453.

## 2. The law was clearly established that Custance's excessive use of lethal force toward Reed was objectively unreasonable at the time of the incident.[1]

Particularly here, at the pleading stage, where the facts alleged—viewed in the light most favorable to Bright—and reasonable inferences drawn from them plausibly show the Defendant Officers used lethal force at a moment when Reed posed no immediate threat of serious harm, dismissing such a claim is improper. *See Giardina v. Lawrence*, 354 Fed. App'x 914, 916 (5th Cir. 2009) (per curiam) (unpublished).

Here, as in *Baker*, *Cole*, *Hickson*, *Sloan*, and *Flores*,[2] it is hotly disputed whether the

---

[1] Bright incorporates by reference the argument and authorities regarding Fourth Amendment excessive force claims under 42 U.S.C. Section 1983, as articulated in in Bright's Response to Custance's Motion to Dismiss (Doc.24, at 9–12).

[2] *See Baker v. Putnal*, 75 F.3d 190 (5th Cir. 1996); *Cole*, 935 F.3d 448-49, 457; *Hickson v. City of Carrollton*, No. 3:18-CV-02747-B (BH), 2020 WL 3810360, at *6 (N.D. Tex. June 16, 2020), *report & recommend. adopted sub nom*, *Hickson ex rel Estate of Hickson v. City of Carrollton*, No. 3:18-CV-02747-B, 2020 WL 3798856 (N.D. Tex. July 7, 2020); *Keeton*

Defendant Officers actually saw or could have seen Reed with a gun—and whether Reed actually did anything threatening—and undisputed that officers never warned Reed before using deadly force:

- Brock said "Reed did not shoot at officers. In fact, she indicated that Reed would have not been able to fire any shots as fast at the unannounced shooting commenced" (Doc. 1 at ¶ 27). She also said "the police did not announce themselves before the shots began" (*Id.*);

- Conversely, in their statements not given until five to eight days after the event, the officers all "tell a specific story that the initial gunfire was from Reed using a small arms pistol or handgun and therefore could not have been from Custance's rifle or from Baskett's handgun or another police shooter's handgun" (*Id.* at ¶ 33);

- While Custance initially told supervisors after the raid "that he did not shoot his firearm at the scene," he later "admitted that he did shoot at the back of the Reed residence" and "alleged that he began shooting when he saw muzzle flashes and heard gunfire" (*Id.* at ¶ 32) but did not say he saw the person shooting. Yet somehow, Custance concluded "the person inside of the room was clearly firing a weapon" (*Id.* at ¶ 37);

- Five days after the raid, Hatfield claimed "he heard a 'pop' from a handgun in the direction of Reed's bedroom window" then "observed a right hand and arm holding a 'black' in color handgun coming out of the bedroom window" pointed at Baskett and Suess (*Id.* at ¶ 34). Further, Hatfield claims "he heard the person inside the residence that was holding the handgun outside the window continue to fire" two to three more times (*Id.*) before backing into the bedroom (*Id.* at ¶ 35);

- Eight days after the raid, Baskett said "he saw a gun come out of bedroom window and heard approximately two to three shots fired 'from the suspects handgun.' Baskett alleges that he then drew his department issued handgun and began to shoot at Reed who was still holding a gun and pointing it out of the window" (*Id.* at ¶ 39);

- Also eight days later, Suess said he saw "a black arm holding a handgun come out of the bedroom window" and that "the handgun fired two times in a fast manner." (*Id.* at ¶ 40). Then, he said he saw Baskett fire his gun at Reed but Suess "did not fire at Reed since he was unable to see the subject and did not want to shoot wildly into the residence." (*Id.*).

And, considering the view inside the bedroom window was obstructed by smoke from the flashbang grenades, a curtain or blanket hanging from the window, and trees (*Id.* at ¶ 22), these

---

*Geiger v. Sloan*, 780 F. App'x 150, 154-55 (5th Cir. 2019); *Flores v. Harris*, No. CV H-17-3817, 2019 WL 1426313, at *16–17 (S.D. Tex. Mar. 29, 2019) (slip op.).

allegations suggest the Defendant Officers may not have even been able to see Reed with a gun. Moreover, ballistic and forensic evidence suggests the gun Reed had was not—and could not be—fired in its condition most certainly not two to four times. (*Id.* at ¶¶ 48–49).

Therefore, like in *Hickson*, these factual disputes over what happened in the moments leading to Reed's death go to the heart of both (1) whether the Defendant Officers reasonably perceived a threat of imminent harm and (2) whether Defendant Officers' actions violated a constitutional right that was clearly established at the time he shot. Thus, the Defendant Officers are not entitled to qualified immunity on Bright's excessive force claims.

3.   **The Defendant Officers need not have fired the single lethal bullet to be subject to liability for violating Reed's Fourth Amendment, which the no-knock no-announce raid and the excessive force directed at Reed violated as well.[3]**

First, as explained in Bright's Response to Custance's Motion to Dismiss, each Defendant Officer did not need to fire the bullet that killed Reed for each of their use of lethal force directed at Reed to be excessive and unconstitutional. The Defendant Officers' motion expresses the same misconceptions Custance had, arguing that "[f]our officers . . . cannot have fired the one bullet that hit and killed Reed" and that "[w]ithout specifying which officer's bullet actually hit and killed Reed, Plaintiff has not adequately alleged a claim against any of the officers." (Doc. 22 at 4). Like Custance, the Defendant Officers are incorrect. Moreover, the Defendant Officers misunderstand Bright as "attempting a bystander claim" for the other Defendant Officers failing to address the constitutional violation committed by whatever officer fired the lethal bullet. (*Id.* at 4). Each officer violated Reed's Fourth Amendment when they fired lethal force at him without justification; Bright's claims do not rest on bystander liability.

---

[3] Bright incorporates by reference the argument and authorities regarding Fourth Amendment violations of (1) excessive force directed at Reed and (2) the no-knock no-announce warrant itself, as articulated in in Bright's Response to Custance's Motion to Dismiss (Doc.24, at 6–8, 13–15).

Even if the bullets from a particular officer did not strike Reed, each officer who fired in his direction still subjected Reed to direct police action, in violation of his Fourth Amendment rights. *See Petta v. Rivera*, 143 F.3d 895 (5th Cir. 1998) (per curiam). The officer's violence constituted direct "acts that the children experienced themselves." *Young v. Green*, No. H–11–1592, 2012 WL 3527040, at *5 (S.D. Tex. Aug. 15, 2012) (citing *Petta*). Thus, Bright's Complaint is not defective because it only alleges that one officer's bullet ultimately struck Reed.

Second, even the officers' assault on his home was a Fourth Amendment "seizure," because Reed's freedom of movement was terminated by the no-knock no-announce raid. *See Brower v. Cty. of Inyo,* 489 U.S. 593, 599 (1989); *see also Brendlin v. California*, 551 U.S. 249 (2007); *see also Lytle v. Bexar Cty.*, Tex., 560 F.3d 404, 410 (5th Cir. 2009). The Defendant Officers had no specific information showing that they knew Reed was armed and dangerous or would pose a legitimate safety concern if officers announced their police presence and that they were there to execute a warrant and waited before entering Reed's home by violent force.

Like the officers in *Bishop* and *Cantu,* the Defendant Officers cannot rely on what they claim Reed did in response to the raid in order to justify entering his home in the first place; the initial attempt itself was unreasonable. *See Bishop v. Arcuri*, 674 F.3d 456, 456 n.6, 463–64 (5th Cir. 2012); *see also United States v. Cantu*, 230 F.3d 148, 152–53 (5th Cir. 2000). The Killeen PD's narcotics warrant did not create any exigency justifying forcible entry without first knocking, announcing, and waiting to assess the need to enter forcibly at all. Nor did alleging that a taser had to be used against Reed during an arrest a decade earlier constitute specific facts showing Reed posed officers an immediate danger ten years later. In fact, Reed's record did not contain any gun charges that could reliably suggest he would be armed and, unlike the suspect in *Linbrugger*, Reed made no threats of violence toward anyone warranting police intervention and did not threaten

officers in any way before they forcibly broke into his home. (*See* Doc. 1 at ¶ 19); *cf. Linbrugger v. Abercia*, 363 F.3d 537, 542 (5th Cir. 2004).

Because it was clearly established that the initial forcible entry into Reed's home was unconstitutional, even if Reed defended his home with a weapon, such officer-manufactured "exigent circumstances" do not justify further Fourth Amendment violations. *Id.* at 153 n.1. Accordingly, the no-knock no-announce night-time raid of Reed's home itself violated Reed's Fourth Amendment rights and resulted in the excessive lethal force that killed Reed.

**C.   Bright alleges sufficient facts to state conspiracy claims against the Defendant Officers under Sections 1983 and 1985(3).[4]**

In addition to stating the elements of 1985(3) claim (as articulated in Bright's Response to Custance's Motion), Defendants set forth elements they urge must be shown for a 1983 conspiracy claim. (Doc. 22 at 8) ("[1] the existence of a conspiracy that involves state action; and [2] the deprivation of civil rights in furtherance of a conspiracy by a party to the conspiracy," where a civil "conspiracy" requires "[a] two or more persons; [b] an object to be accomplished; [c] a meeting of the minds on the object or course of action; [d] one or more unlawful, overt acts; and [e] damages as a proximate result.") (citing *Wackman v. Rubsamen*, 602 F.3d 391, 408 (5th Cir. 2010) and *Salts v. Moore*, 107 F. Supp. 2d 732 (N.D. Miss. 2000)).

The Defendant Officers contend that their presumption that Bright alleges Reed shot at officers negates the fourth element of Bright's 1985(3) conspiracy claim (the deprivation of a right or privilege) and the second and fourth elements of a civil conspiracy (an object to be accomplished and one or more unlawful, overt acts) required for her Section 1983 conspiracy claim. (Doc. 22 at 8). As explained, this presumption is entirely incorrect. Thus, the Defendant Officers have not

---

[4] Bright incorporates by reference the argument and authorities regarding conspiracy claims under 42 U.S.C. Sections 1983 and 1985(3), as articulated in in Bright's Response to Custance's Motion to Dismiss (Doc. 24).

challenged any of these elements.

The Defendant Officers also contend that because they were all employees of the City of Killeen when Bright alleges they agreed to fabricate their story, they could not have conspired because the officers "are not considered separately from the [City] or each other" under the "single entity doctrine." (*Id.*). But, as explained in Bright's Response to Custance's Motion to Dismiss, Bright's conspiracy claims are against the officers individually, and not under a *respondeat superior* theory or as agents of the City of Killeen. (*See* Doc. 24 at 18–20). Nor do these claims against the Defendant Officers implicate the policy concerns that may arise when official communications are subject to conspiracy claims. (*See id.*). Thus, the "single entity doctrine" should not bar Bright's conspiracy claims against the Defendant Officers in their individual capacities.

Finally, in challenging whether Bright alleges there was a "meeting of the minds" among the officers to deprive her of her rights, Defendants claim she "has not alleged any facts to show that Hatfield, Suess, and Baskett had a meeting of the minds, with each other or with anyone else, to accomplish an unlawful act." (Doc. 22 at 9). But Bright specifically alleges that the Defendant Officers Custance, Hatfield, Baskett, and Suess conspired:

- "to cover up their excessive and deadly acts" (Doc. 1 ¶¶ 3, 16);

- to "cover up for the failures to follow protocol and policy by all of the Defendants" and "us[ing] that information to tell a specific story that the initial gunfire was from Reed using a small arms pistol or handgun and therefore could not have been from Custance's rifle or from Baskett's handgun or another police shooter's handgun" (*Id.* ¶ 33);

- when "all four Defendant officers lied about the shooting in an effort to cover up their failures to act in an objectively reasonable manner" (*Id.* ¶ 57);

- by Hatfield, Baskett, and Suess "fabricat[ing] a story that Reed stuck his arm out of the window and shot at them first" while "Custance lied and tampered with evidence" "[i]n an attempt to justify their unprovoked use of deadly force" (*Id.* ¶ 59); and

- "reach[ing] an agreement amongst themselves to cover up their misconduct by telling

investigators that Reed shot at them two to four times and caused the injury to Suess before they returned fire, and to thereby deprive Reed of his constitutional rights, all as described in the various paragraphs of this Complaint" (*Id.* ¶ 110; *see also Id.* ¶ 104).

And Bright alleges that the purpose of their agreement was to deprive her of her Fourteenth Amendment right to access the courts to recover for the Fourth Amendment violations to Reed, by crafting a unified story that they hope will release them of liability for killing Reed.

These allegations are supported by the facts that the officers initially gave varying accounts of what happened, none indicating they heard Custance firing his weapon. And, even after Custance was forced to admit he lied about not even being in a position to shoot Reed (and to admit he did, in fact, did shoot at Reed), officers Custance and Hatfield waited five days  and officers Baskett and Suess waited eight days to develop and provide their written statements. (*Id.* ¶¶ 35–40). Bright alleges this gave them plenty of time to develop a unified story with the same key elements: hearing gunfire they claim was not fired by officers; a person firing from inside Reed's bedroom; a hand holding a gun through the bedroom window; and two to four shots being fired at officers in rapid succession. (*See id.* ¶¶ 35–41). There can be no doubt, then that Bright alleges that after wrongfully killing Reed during the unconstitutional no-knock no-announce raid, the Defendant Officers and Custance had a meeting of the minds to unify a story for the purpose of preventing Bright from bringing a successful claim against them for violating Reed's Fourth Amendment.

Therefore, whether under Section 1983 or Section 1985(3), Bright's allegations are sufficient to state a conspiracy claim against the Defendant Officers.

**D.     In the alternative, and only if this Court finds Plaintiff's claims deficient in any respect, Plaintiffs seek leave to amend their Complaint or file a Rule 7(a) reply.**

As noted in detail above, Bright believes she has adequately pled sufficient claims against the Defendant Officers and, thus, their motion should be denied. But if the Court believes

allegations are deficient in some respect, Bright respectfully asks for leave to amend her Complaint.

"[L]eave to amend shall be freely given when justice so requires and should be granted absent some justification for refusal." *U.S. ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 386 (5th Cir. 2003) (citing Fed. R. Civ. P. 15(a)). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis,* 371 U.S. 178, 182 (1962). Thus, leave should be given unless the following factors weigh heavily against amendment: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failures to cure deficiencies by prior amendment; (4) undue prejudice to the opposing party; and (5) the futility of the amendment. *See U.S. ex rel. Hebert v. Dizney,* 295 Fed. Appx. 717, 724 (5th Cir. 2008).

Here, none of these factors are present. Accordingly, if Bright's allegations are deficient in some respect, she asks that she be granted leave to amend her Complaint.

## IV.    PRAYER

For these reasons, Plaintiff Diane Reed Bright, individually as the surviving mother of James Scott Reed, deceased, and as the personal representative for the Estate of Decedent James Scott Reed, respectfully asks that this Court deny Defendants Hatfield, Baskett, and Suess's Rule 12(b)(6) Motion to Dismiss (Doc. 22)  in its entirety. Plaintiff further respectfully seeks all other relief to which she may be entitled.

Respectfully submitted,

By: */s/ Daryl K. Washington*

      **Daryl K. Washington**
      State Bar No. 24013714
      dwashington@dwashlawfirm.com
      **WASHINGTON LAW FIRM, PC**
      325 N. St. Paul St., Suite 3950
      Dallas, Texas 75201
      Telephone: (214) 880-4883
      Facsimile:   (214) 751-6685

      **ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on **July 28, 2020**, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case filing ("ECF") system of the Court. All counsel of record were served via electronic service through the ECF system.

| | |
|---|---|
| **Charles D. Olson** | **Roy L. Barrett** |
| colson@haleyolson.com | barrett@namanhowell.com |
| **Michael W. Dixon** | **Joe Rivera** |
| mdixon@haleyolson.com | jrivera@namanhowell.com |
| HALEY & OLSON, P.C. | NAMAN, HOWELL, SMITH & LEE, PLLC |
| 100 N. Ritchie Road, Suite 200 | 400 Austin Avenue, Suite 800 |
| Waco, Texas 76712 | P.O. Box 1470 |
| ***Attorneys for Defendant*** | Waco, Texas 76703-1470 |
| ***Anthony R. Custance*** | ***Attorneys for Defendant the City of Killeen,*** |
| | ***Texas, Richard A. Hatfield, Jr., Fred L.*** |
| | ***Baskett, and Christian Suess*** |

*/s/ Daryl K. Washington*
**Daryl K. Washington**