IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| DIANE REED BRIGHT, INDIVIDUALLY, and as the PERSONAL REPRESENTATIVE FOR THE ESTATE OF DECEDENT, JAMES SCOTT REED | § § § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO. 6:20-CV-431 |
| THE CITY OF KILLEEN, TEXAS; ANTHONY R. CUSTANCE; RICHARD A. HATFIELD, JR.; FRED L. BASKETT; and CHRISTIAN SUESS, | § § § § § § § | |
| *Defendants*. | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT THE CITY OF KILLEEN'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO RULE 12(b)(6)**

Plaintiff Diane Reed Bright, individually as the surviving mother of James Scott Reed, deceased, and as the personal representative for the Estate of Decedent James Scott Reed, files this Response to Defendant the City of Killeen, Texas ("the City")'s Motion to Dismiss Plaintiff's Complaint Pursuant to Rule 12(b)(6) (Doc. 21) and respectfully shows the Court as follows:

### I. SUMMARY OF OPPOSITION

Bright's Complaint goes well beyond what is required at the pleading stage, particularly given that minimal factual allegations (such as the topic of the targeted policy or custom) are sufficient to satisfy federal pleading standards for a municipal liability claim. Specifically, Bright targets several topics of City policies: to "sho[o]t first and ask[] questions later," rather than issuing warnings or using de-escalation tactics or even using the degree of force that is objectively reasonable; and to ignore the need to train Killeen PD officers in techniques intended to prevent

any use of force (let alone unconstitutional force) and in when and how to properly execute a no-knock warrant, which has been the subject of numerous incidents. Further, by opting not to discipline officers who showed they were inadequately trained in these aspects, the City ratified the use of deadly force when no immediate threat of harm exists, as well as the indiscriminate, unconstitutional execution of no-knock warrants.

These allegations are more than sufficient to give the City notice of the claims against it and the basis for such claims. For these reasons, the City's motion should be denied in its entirety. Alternatively, only if the Court finds Bright's allegations at all deficient, she requests leave to amend her Complaint.

## II.     RELEVANT FACTUAL BACKGROUND[1]

The City of Killeen has a history of using controversial and dangerous "no-knock" search warrants, which have directly caused numerous injuries and fatalities. (Doc. 1 at 1). In fact, police detective Charles "Chuck" Dinwiddie was killed during the Killeen Police Department ("Killeen PD")'s early-morning raid on Marvin Guy's apartment May 9, 2014. (*Id.* at 1–2). Just five nights before the 2014 raid, a burglar had broken through the window of a ground-floor unit in the apartment complex directly across from Guy's apartment and nearly choked a young woman to death during the break-in.[2] Fearful of a violent break-in in his own ground-floor apartment, Guy barricaded his front door with a chair before going to bed. *Id.* Before sunrise, "Guy says he had his back to the window when he was awakened by shattering glass. He insists that he did not hear

---

[1] The facts of the Killeen PD's violent raid of Reed's apartment—in which Officers Hatfield, Baskett, Suess, and Custance broke into Reed's home before sunrise without knocking or announcing their purpose or presence under the auspices of executing a narcotics search warrant—are detailed in the facts about the raid in Bright's responses to the Officers' motions to dismiss. (*See* Bright's Resp. to Custance's Mot. to Dismiss (Doc. 24); *see also* Bright's Resp. to Officers Hatfield, Baskett, and Suess's Mot. to Dismiss (Doc. 25). Accordingly, Bright incorporates the factual background articulated in those motions, for all purposes, as if fully stated herein.
[2] Kevin Sack, *Murder or Self-Defense if Officer Is Killed in Raid?*, NEW YORK TIMES (Mar. 18, 2017), *available at* https://www.nytimes.com/interactive/2017/03/18/us/texas-no-knock-warrant-drugs.html.

any announcement and thought he was being robbed." *Id.* Guy fired at the intruders, ultimately wounding one officer, and killing officer Dinwiddie. *Id.* In the deadly raid, officers only found about one gram of cocaine. *Id.*

Dinwiddie's death prompted Retired Lieutenant Colonel Larry Cole, who served on the Killeen City Council (the "City Council") from 2006 to 2011, to send a letter to Killeen administrators and City Council members calling for the City to suspend the Killeen PD's use of these no-knock warrants. (*Id.* at 2). Even before Dinwiddie's death, Cole reached out to the City Council concerning no-knock warrants, explaining that executing search warrants in that manner creates "too much risk, not just to the officers, but to the neighborhood. . . . I don't think the risk warrants the reward."[3] Cole never received a response. (Doc. 1 at 2.). In the face of Cole's warnings—and only three months after Dinwiddie was killed during a no-knock raid—the Killeen PD executed yet another no-knock warrant, clearly disregarding the dangers inherent in doing so.

Other law enforcement agencies across the state and country, including the Houston Police Department, have determined that the risks associated with no-knock raids outweigh the benefits. (Doc. 1 at 2). A no-knock narcotics raid January 28, 2019, in which four Houston police officers were shot and injured and the two suspects killed, familiar questions about the use of controversial no-knock warrants again arose.[4] According to a 2014 ACLU study of twenty police departments, "no-knock warrants were used (or probably used) in about 60 percent of the incidents in which SWAT teams were searching for drugs, even though many resulted in the SWAT team finding no drugs or small quantities of drugs." *Id.* And according to a 2017 New York Times investigation,

---

3 Kyle Blankenship, *Former Killeen councilman Cole dies after early-morning crash,* KILLEEN DAILY HERALD (Oct. 5, 2018), *available at* https://kdhnews.com/former-killeen-councilman-cole-dies-after-early-morning-crash/article_ea944c5e-c8dc-11e8-bad1-3369075a3c83.html; *see also* Doc. 1 at 2.
4 Leif Reigstad, *A No-Knock Raid in Houston Led to Deaths and Police Injuries. Should Police Rethink the Practice?*, TEXASMONTHLY.COM (Feb. 2, 2019), https://www.texasmonthly.com/news/a-no-knock-raid-in-houston-led-to-deaths-and-police-injuries-should-police-rethink-the-practice/.

which found that between 2010 and 2016, 31 civilians and eight officers died during no-knock raids, while "scores of others were maimed or wounded" while the "searches yield only enough drugs to charge suspects with misdemeanors." *Id.*[5]

Despite these known dangers, in 2014, a study by the Texas Civil Rights Project found that many of the largest Texas law enforcement agencies had no written policies for executing "no-knock" search warrants.[6] The study, released two months after Burleson County Sheriff's Deputy Adam Sowders was killed December 19, 2013 while executing a no-knock warrant, showed that only 53 of the 161 agencies surveyed had written policies on the matter. *Id.* The organization's director said that "[o]fficers need to understand what the law is, when they can do [a 'no-knock'] and when they can't." *Id.*

In her suit to recover for James Scott Reed's injuries and death during the Killeen PD's February 27, 2019 unannounced raid on Reed's home, Bright alleges that the City Council and Chief of Police Charles F. Kimble had a duty—but failed—to implement and enforce such City policies that respected Reed's constitutional rights to protection and equal treatment under the law. (Doc. 1 ¶¶ 1–3). Bright says Reed's death was caused by a de facto policy of using lethal, unjustified force without warning or any attempt to de-escalate. (*Id.* ¶¶ 63–65). Further, she claims his death directly resulted from inadequate, or non-existent, City policies for training Killeen PD officers on properly executing no-knock warrants, using force (particularly deadly force), and using less deadly means and techniques for warning or de-escalation to avoid using force at all. (*Id.* ¶¶ 85–87). These policy failures, Bright claims, "unnecessarily caused Reed to die at the hands

---

[5] Kevin Sack, *Door-Busting Drug Raids Leave a Trail of Blood*, NEWYORKTIMES.COM (Mar. 28, 2017), https://www.nytimes.com/interactive/2017/03/18/us/forced-entry-warrant-drug-raid.html.
[6] Andrea Salazar, *Study: 'No-knock' policies seldom written down by Texas law enforcement agencies*, THE EAGLE (Feb. 19, 2014), *available at* https://theeagle.com/news/local/study-no-knock-policies-seldom-written-down-by-texas-law-enforcement-agencies/article_76d4b334-5c35-5706-b07d-542c77c3e741.html.

of police officers who engaged in the excessive and deadly use of force after invading his home using the vicious tactic of a no-knock, no-announce raid." (*Id.* ¶ 3).

According to Bright, the City knew from well-documented history and danger of no-knock warrants and the "widespread practice of misconduct and/or injuries" resulting from no-knock warrants demanded proper training if the Killeen PD was to continue the practice at all. (*Id.* ¶¶ 66, 81, 100). Despite this knowledge, however, the City implemented no policy on no-knock warrants, and no policy on training officers when and how the constitution permits no-knock warrants or on the constitutional use of force. (*Id.*). Instead, Bright alleges, the City continued its de facto policy to "shoot first and ask questions later." (*Id.* ¶ 91).

### III.   ARGUMENT & AUTHORITIES

**A.    Applicable legal standards.**

    **1.    Pleading standards for a Rule 12(b)(6) motion.**

The pleading stage is not the point at which plaintiffs must establish the level of proof necessary to ultimately prevail. *See Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977). Indeed, a "strong framework of policy considerations . . . militate[s] against granting motions to dismiss for failure to state a claim[.]" *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). Thus, in the Fifth Circuit, motions to dismiss "are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 231 (5th Cir. 2009); *see also Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011). A complaint will not be dismissed merely because it contains an imperfect statement of the legal theory supporting the claim asserted. *Johnson v. City of Shelby*, 135 S. Ct. 346, 346 (2014). Federal pleading rules simply call for "a short and plain statement of the claim showing that the pleading is entitled to relief." *Id.* (citing Fed. R. Civ. P. 8(a)(2)).

The ultimate question in a motion to dismiss is whether the complaint states a valid claim

when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter*, 313 F.3d 305, 312 (5th Cir. 2002). Two primary principles guide the plausibility analysis: Courts must "liberally construe the complaint in favor of the plaintiff" and must "accept all well-pleaded factual allegations as true." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Importantly, courts do not evaluate the merits of the allegation but only consider whether plaintiff has adequately pled a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004). A pleading simply needs to provide "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements." *Morgan v. Hubert*, 335 F. App'x 466, 470 (5th Cir. 2009).

      **2.**      **Pleading standards for Bright's municipal liability claim.**

The City is liable "if it . . . causes a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978). Ordinarily, official municipal policies are contained in duly promulgated policy statements, ordinances, or regulations. *Webster v. City of Hous.*, 735 F.2d 838, 842 (5th Cir. 1984). But a policy may also be evidenced by a custom, even if such custom has not received formal approval. *Id.* In fact, even a facially innocuous policy will support liability if it were promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result. *Piotrowsky v. City of Hous.*, 237 F.3d 567, 579 (5th Cir. 2001) (quoting *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997)). Therefore, municipal liability under Section 1983 requires proof of three elements: (1) an official policy; (2) promulgated by a final policymaker; (3) that is a moving force behind the violation of the constitutional right. *See Monell*, 436 U.S. at 694.

In the municipal liability context, "only minimal factual allegations should be required at

the motion to dismiss stage." *Thomas v. City of Galveston, Tex.*, 800 F. Supp. 2d 826, 842–43 (S.D. Tex. 2011); *see also Speck v. Wiginton*, 606 F. App'x 733, 735–36 (5th Cir. 2015) (per curiam). That is because it is "exceedingly rare that a plaintiff will have access to (or personal knowledge of) specific details regarding the existence or absence of internal policies or training procedures prior to discovery." *Thomas*, 800 F. Supp. 2d at 842; *see also Sanchez v. Gomez*, 283 F. Supp. 3d 524, 532 (W.D. Tex. 2017). While a municipal liability complaint must state more than "boilerplate allegations," stating a claim does not "require[e] plaintiffs to plead specific factual details to which they do not have access before discovery, on the other." *Thomas*, 800 F. Supp. 2d at 842; *see also Schaefer v. Whitted*, 121 F. Supp. 3d 701, 718 (W.D. Tex. 2015) (agreeing with the pleading standard articulated in *Thomas*).

Thus, unlike claims against officers, a municipal liability claim satisfies the federal pleading standard if it describes, for instance: "(1) past incidents of misconduct by the defendant to others; (2) multiple harms that occurred to the plaintiff himself; (3) the involvement of multiple officials in the misconduct; (4) the specific topic of the challenged policy or training inadequacy,"[7] or (5) "misconduct that occurred in the open,"[8] "together with any additional elaboration possible." *Flanagan v. City of Dall., Tex.*, 48 F. Supp. 3d 941, 947 (N.D. Tex. 2014). "Those types of details, together with any additional elaboration possible, help to (1) 'satisfy the requirement of providing not only fair notice of the nature of the claim, but also grounds on which the claim rests;'[9] and (2) 'permit the court to infer more than the mere possibility of misconduct.'"[10] *Id.* Finding a complaint insufficient even when it describes the specific topic of the targeted policy, procedures, or failures in supervision, training, and discipline—and elaborates to the extent possible without discovery—

---

[7] *Flanagan v. City of Dall., Tex.*, 48 F. Supp. 3d 941, 947 (N.D. Tex. 2014).
[8] *Thomas*, 800 F. Supp. 2d at 843–44.
[9] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007) (internal quotations omitted).
[10] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

imposes a different, impermissibly high standard of the sort this jurisdiction has rejected. *See, e.g., Wright v. City of Dallas*, No. 3:09–CV–1923–B, 2010 WL 3290995, at *3 (N.D. Tex. Jul. 19, 2010), *report & recommend. adopted*, 2010 WL 3291816 (Aug. 19, 2010).

Furthermore, where a complaint does not "identify which training policy and/or procedures were inadequate or how this alleged inadequacy directly caused" the alleged violation in a municipal liability claim:

> [t]he failure of specificity is no fault of Plaintiff's, . . . because he has not yet had the benefit of discovery. Plaintiff is bound by Rule 11 to allege only those facts for which he has or will likely have evidentiary support.
>
> As the Fifth Circuit explained in *Schultea v. Wood*, a plaintiff is not required to plead facts "peculiarly within the knowledge of defendants."

*Williams v. City of Denton*, Tex., No. 4:17-CV-00811, 2019 WL 438403, at *10 (E.D. Tex. Jan. 10, 2019), *report & recommend. adopted*, 2019 WL 430913 (E.D. Tex. Feb. 4, 2019) (citations omitted) (quoting *Schultea v. Wood*, 47 F.3d 1427, 1432 (5th Cir. 1995) and *Hubert*, 335 F. App'x at 472).

In *Williams*, the court found the complaint showed the plaintiff "suffered harm at the hands of the City's employees," the allegations lacked "the requisite specificity regarding how such policies, customs, or practices were promulgated and fail[ed] to specify any particular training deficiency or how any such deficiency contributed" to the harm suffered. *Id.* at *9. However, "[t]he facts omitted here are squarely within that category" of facts peculiarly within the knowledge of defendants. *Id.* at *10. Thus, rather than dismiss the claim, the court "allow[ed] discovery limited to the issue of the City's policies, practices, or customs regarding excessive force and police officer training regarding the use of excessive force," waiting to "decide the issue of the City's liability once that discovery is complete." *Id.*

Therefore, to the extent Bright's Complaint is not yet able to identify information

peculiarly within the knowledge of the City, "[t]he failure of specificity is no fault of" Bright's, "because [s]he has not yet had the benefit of discovery." *Id.*

**B.  Bright's allegations are sufficient to state a claim for municipal liability based on the City's policies of excessive force and of inadequately training on constitutionally using force and executing search warrants without knocking.[11]**

**1.  Chief Kimble and the Killeen City Council are policymakers with regard to the policies of excessive force and inadequate training at issue here.**

A policymaker is one with "final authority to establish municipal policy with respect to the action directed by, or taken by, him." *Williams v. City of Luling*, 802 F. Supp. 1518, 1529 (W.D. Tex. 1992); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). But the Fifth Circuit does not require plaintiffs to specifically identify the policymaker to survive a motion to dismiss. *See Groden v. City of Dall.*, 826 F.3d 280, 284 (5th Cir. 2016). "[T]he specific identity of the policymaker is a legal question that need not be pled." *Id.* Rather, at the pleading stage, Bright "need only allege facts that show an official policy, promulgated or ratified by" a City policymaker that she claims caused the injuries in question. *Id.*

Bright more than satisfies that burden here. Although not required to do so, she specifically alleges that two policymakers—the Killeen City Council and Chief Kimble—had the authority to set the Killeen PD's policies for the use of force and no-knock search warrants, to set policies for training Killeen PD officers to comply with such policies; and to supervise and discipline officers for non-compliance with such policies. As alleged, therefore, these policymakers promulgated or ratified the policies that subject the City to Section 1983 liability.

---

[11] The City's challenge to Bright's conspiracy claim under 42 U.S.C. Section 1985(3) is based on misunderstanding Bright as alleging a conspiracy claim against the City. (*See* Doc. 21 at 8). To clarify, Bright alleged conspiracy under Section 1985(3) against the Officers but did not intend to allege conspiracy against the City.

### 2. The City's de facto policy of using unreasonable and unjustifiable force gives rise to Section 1983 liability.[12]

At the pleading stage, plaintiffs may rely on minimal factual allegations, including but not limited to "the specific topic of the challenged policy or training inadequacy." *Thomas*, 800 F. Supp. 2d at 842-44; *see also Brown v. City of Hous.*, 297 F. Supp. 2d 748, 767 (S.D. Tex. 2017); *Sanchez*, 283 F. Supp. 2d at 532. In *Brown v. City of Houston*, for instance, the district court properly found municipal liability allegations sufficient where the plaintiff identified the District Attorney's office's "do whatever it takes" conviction culture as the policy or custom that was the "moving force" behind his constitutional injuries. *Brown*, 297 F. Supp. 3d at 766. And in *Flanagan v. City of Dallas*, alleging "a combination of statistics, past incidents, and statements by city officials" was sufficient to state a *Monell* claim against the City of Dallas for policies that plaintiffs alleged were the moving force behind the excessive deadly force in question. *Sanchez.* 283 F. Supp. 3d at 536 (citing *Flanagan*, 48 F. Supp. 3d at 953).

Here, Bright alleges the City has a de facto policy of using unreasonable and unjustifiable force on suspects like Reed. (Doc. 1 ¶ 63). It is hotly disputed whether Reed even had a gun—or actually did anything threatening—when the Officers seized Reed during the no-knock raid. However, it is undisputed that officers never warned Reed before using deadly force. (*Id.*). At the time, it was clearly established law that when allegations do not clearly show an immediate threat of harm, the use of deadly force is objectively unreasonable. *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. Aug. 20, 2019) (reh'g en banc) (where officers "had the time and opportunity to give a warning and yet chose to shoot first instead," it was an "obvious case" where "conduct violates

---

[12] In responding to the motions to dismiss filed by Officer Custance (Doc. 20) and Officers Hatfield, Suess, and Baskett (Doc. 22), Bright explains why executing a no-knock search warrant and directing lethal force at Reed violated Reed's Fourth Amendment rights. Therefore, Bright hereby incorporates by reference, for all purposes, the arguments, and authorities in Section B of her Responses. (*See* Doc. 24; *see also* Pl.'s Resp. to Officers' Mot. to Dismiss).

clearly established law.") (citing *Tennessee v. Garner*, 471 U.S. 1, 2 (1985)).

Moreover, Bright alleges that the City has known for years of the "persistent, widespread practice" of Killeen PD officers following this "shoot first, ask questions later" policy during no-knock warrants—a policy that has continually resulted in injuries and death to officers and suspects alike. (Doc. 1 ¶¶ 92–93). In fact, Bright alleges that in 2014, a former member of the City Council itself urged the City to abandon the practice of executing no-knock warrants—but was ignored by the City—just months before the controversial practice resulted in the death of an officer during precisely the type of unannounced, pre-dawn narcotics raid that killed Reed. (*Id.* at 1–2). There, the suspect fired on what he thought were intruders when, under circumstances similar to this case, he thought the unannounced police were intruders and was fearful after violent attacks on other ground-floor apartments in his neighborhood less than a week prior. Nevertheless, the Killeen PD has continued to use this controversial tactic, executing at least 81 no-knock warrants since 2012, despite these incidents in Killeen and calls to ban the tactic nationwide. (*Id.*).

These repeated incidents demonstrate a longstanding history of Killeen PD officers resorting to using force where it is unjustified, and without first warning or de-escalation tactics, particularly during no-knock raids, which necessarily involve limited warnings. Moreover, these incidents support Bright's allegations that the City in fact employs de facto policies to "shoot first, ask questions later" and to disregard warnings and de-escalation tactics. (*Id.* ¶¶ 63, 91).

And, at the pleading stage, Bright need only specify the topic of the policy underlying the injuries at issue. Given that it was sufficient in *Brown v. City of Houston* to identify a "do whatever it takes" conviction culture as the policy underlying the plaintiff's injury, identifying the City's "shoot first, ask questions later" policy—and failing to use tactics to prevent using lethal force, particularly given the inherent lack of warning during no-knock raids—is more than sufficient.

### 3. The City's inadequate training on the constitutional limits on deadly force and on executing no-knock warrants gives rise to Section 1983 liability.

It is well-settled that "a municipality's failure to train its police officers can without question give rise to § 1983 liability." *World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 380 (1989). To establish the City's liability under a failure to train theory, Bright must show: "(1) inadequate training procedures; (2) inadequate training caused the police officer to use excessive force; and (3) the deliberate indifference of municipal policymakers." *Rivera v. City of San Antonio,* No. SA-06-CA-235-XR, 2006 WL 3340908, at *13 (W.D. Tex. Nov. 15, 2006) (citing *Piñeda v. City of Hous.*, 291 F.3d 325, 331–32. (5th Cir. 2002)).

Liability under a failure-to-train theory arises where the officers' assigned duties make "the need for more or different training [] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Harris*, 489 U.S at 390. This Court in *Rivera* held that facts showing "that a police officer has received no or inadequate training in handcuff policies, offenders' rights, detainee relations, or Fourth Amendment protection" would be sufficient to impose municipal liability under a failure-to-train theory. *Rivera*, 2006 WL 3340908, at *13. Even where a municipal training program exists, if it is inadequate, the city is subject to liability on a "failure to train" theory. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010).

Bright contends that the City has an unwritten policy of inadequately training its officers—if at all—in proper procedures for executing a no-knock warrant, using force (particularly deadly force), as well as using less deadly means and techniques for warning or de-escalation to avoid using force at all. (Doc. 1 ¶¶ 64–65, 85–87, 93). A direct result of the City's training failures was that the Officers executed a no-knock no-announce search warrant where the circumstances did

not call for it, causing Reed to be seized in violation of the Fourth Amendment. (*Id.*). And, as a direct result of the City's training failures, the Officers created a chaotic and violent situation, escalating tensions in defiance of what lethal force standards require, and resulting in their use of lethal—and objectively unreasonable—force against Reed, even as facts indicate Officers could not have reasonably perceived Reed posed them any immediate threat. (*Id.*).

These officers were trained to act in the violent, barbaric manner in which they did, towards an innocent citizen. Former City Council member Larry Cole's "letter to Killeen administrators and Council members calling for a suspension of 'no-knock' search warrants" in 2014 after a Killeen PD SWAT officer was killed during another unlawful no-knock raid stands as at least some evidence—in fact, compelling evidence—that the Officers' training was ineffective, inadequate, and ultimately unconstitutional. (Doc. 1 at 2). Thus, Reed's Fourth Amendment violations and death were the highly predictable result of these policies of inadequate—or non-existent—training.

The Officers' use of deadly force in response to a situation that posed them no immediate threat of serious harm was objectively unreasonable and a clear violation of Reed's Fourth Amendment rights. And executing a search warrant of Reed's home without knocking or announcing their identity as police and the purpose of their presence, before violently breaking into Reed's bedroom and fatally shooting Reed, demonstrates an unofficial City policy of simply ignoring whether officers receive additional training when it is obvious. This failure to train is inconsistent with clearly established law.

Remarkably, despite the well-documented dangers to officers and others created when police execute search warrants without announcing their presence or purpose, including the death of Killeen's own officer Dinwiddie in 2014, the City argues that Bright's allegations about such incidents do not "show that the City should have anticipated" that Reed could suffer a violation of

his rights during the no-knock raid. (Doc. 21 at 12). But given the well-known danger no-knock raids pose to officers and suspects alike, breaking into Reed's house unannounced—particularly when the Killeen PD knew that Reed had been fired upon just weeks earlier and had advised him to obtain a weapon for home protection—the City's argument is confounding.

The City also challenges the level of detail with which Bright describes the City's training failures (regarding the procedures for when to what extent the use of force and no-knock warrant execution is constitutional) but, notably, never claims to have any such training policy at all. (*Id.* at 5). Moreover, the City denies that the Officers acted contrary to policy, suggesting that the Officers' unconstitutional conduct was consistent with City policy. (*Id.*). Either way, the parties dispute whether the City's unconstitutional policy—the inadequate training of its officers—was a moving force behind Reed's constitutional injuries and death.

The City trained its officers to do exactly what they did—and that is the problem. Polices on the use of force and search warrants cannot exist in a vacuum. Even where there is a constitutional written policy—which the City has not provided—officers must be trained in how to implement that policy in the field. Here, Officers were allowed to invade suspects' homes unannounced, regardless whether the suspect posed any articulable danger, under the guise of a narcotics warrant. Without any training on how and when to conduct no-knock warrants, Officers manufacture exigent circumstances that they later argue justify using excessive force, despite years of knowledge of the danger no-knock warrants present, and despite lethal force standards requiring warnings and other measures to avoid using lethal force at all.

In short, Reed's death resulted from the precise type of deliberate indifference by the City's failure to adequately train its officers that gives rise to municipal liability under Section 1983. More importantly, there are disputed facts suggesting the City's training procedures were

inadequate, that the municipality was deliberately indifferent in adopting its training policy, and the inadequate training policy directly caused the injuries in question here. In fact, the City failed to provide the necessary training to execute the type of raid that resulted in Reed's death. The City's motion to dismiss Bright's inadequate training claim should, thus, be denied.

> **4. The City's policies, evident from its ratification of the Officers' conduct, were the moving force behind Reed's constitutional injuries.**

A custom may also be shown when a municipality approves of an officer's violation of clearly established law. *See World Wide St. Preachers Fellowship*, 591 F.3d at 755. When a municipality approves a subordinate's conduct and the basis for it, liability for that conduct is chargeable against the municipality because it has "retained the authority to measure the official's conduct for conformance with their policies." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion); *Groden*, 826 F.3d at 284; *see also Balle v. Nueces Cty., Tex.*, 690 Fed. App'x 847, 852 (5th Cir. 2017). Under *Praprotnik*, "post hoc ratification by a final policymaker is sufficient to subject a city to liability because decisions by final policymakers are policy." *Hobart v. City of Stanford*, 916 F. Supp. 2d 783, 793 (S.D. Tex. 2013) (mem. op.) (citing *Praprotnik*, 485 U.S. at 127); *see also Rivera*, 2006 WL 3340908, at *13 (disagreeing with the City that post hoc approval of prior conduct cannot be the moving force behind a constitutional violation.). Thus, ratification may reveal a municipality's pre-existing policy, but the ratification itself also constitutes municipal policy. *Id.*

One violation, "accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." *Bryan Cty.*, 520 U.S. at 409; *see also Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018). Although narrow, this exception generally applies where the facts giving rise to the violation are such that it should have been apparent to the policymaker that

a constitutional violation was the highly predictable consequence of the policy or custom. *Westfall v. Luna*, 903 F.3d 534, 554 (5th Cir. 2018). "The high degree of predictability may also support an inference of causation—that the municipality's indifference led directly to the very consequence that was so predictable." *Bryan Cnty.*, 520 U.S. at 409–410. The Supreme Court has explained that factfinders may even conclude that an "official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

For instance, in *Santibanes v. City of Tomball,* the court held that facts showing "that the City has a policy of turning a blind eye and knowingly refusing to thwart the unconstitutional conduct of its police officers in using excessive force" would show a city policy that was the moving force behind the excessive force claim. *Santibanes v. City of Tomball, Tex.*, 654 F. Supp. 2d 593, 613 (S.D. Tex. 2009). From evidence that the chief of police approved of the officer's use of force, even though the officer's conduct violated the police department's use of force policy, "it is reasonable to infer that Sergeant Williams used deadly force with the knowledge that the City would exact no consequence for his actions." *Id.*

And, in *Rivera*, this Court found that "[w]hen the facts alleged are viewed in a light most favorable to the non-movant, it may be inferred that [the defendant] used excessive deadly force with the knowledge that no disciplinary action would be taken against him by the Police Department." *Rivera*, 2006 WL 3340908, at *13. Such facts showed that the city ratified the officers' conduct—and that such a "policy was the 'moving force' behind the violation." *Id.* (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 170 (5th Cir. 1985) ("Where police officers know at the time they act that their use of deadly force in conscious disregard of the rights and safety of innocent third parties will meet with the approval of city policymakers, the affirmative link/moving force requirement is satisfied.").

Here, the City's policies of excessive force and inadequate training are evident from the fact that the City ratified the Officers' unconstitutional conduct toward Reed. Officers unlawfully seized Reed and used excessive lethal force against Reed in violation of his Fourth Amendment rights, violations of clearly established law consistent with what is well known to occur in no-knock raids. This made it evident that the Officers needed additional training in the use of force and in the circumstances justifying a no-knock search warrant—as well as how to properly execute them. The City under Chief Kimble simply chose not to follow through with the training.

The City did not do so because, in the policymakers' eyes, the Officers' conduct actually conformed with municipal policy. The City retained the authority to measure the Officers' conduct for conformance with its use of force policies, exercised that authority and, ultimately, approved of the Officers' unconstitutional use of deadly force against Reed. And, given that the City has no apparent policy on no-knock warrants, the City effectively approved of the Officers' unlawful seizure of Reed also. Meanwhile, the City continues to send these Officers into the field, subjecting the public to the risks that they would continue to use unlawful force consistent with their inadequate training. The City has also continued the practice of no-knock warrants, without implementing any policy or training to ensure their constitutionality. In doing so, the City has acted in its usual manner and, through its policymakers, ratified the use of excessive force and unlawful no-knock warrants against Reed and others.

By ratifying the Officers' unlawful seizure and use of excessive force against Reed, the City demonstrated that it has a policy of instructing, or at least allowing, officers to violate City policy, knowing that officers are inadequately trained. Rather than defend its failure to train, however, the City contends that it did not ratify the Officers' conduct because after pleading guilty to tampering with evidence, Custance resigned from Killeen PD, "thus negating any alleged

ratification by the City." (Doc. 21 at 8). But Custance's consequences do not relate to his use of excessive force or the unconstitutional no-knock raid conducted on Reed.

Such ratification evidences a policy or custom of sending unsupervised officers into the field with inadequate training regarding the constitutional limits on the use of force and on executing no-knock search warrants. Thus, Bright's claims allege that the City's official policies or customs caused Reed's constitutional deprivations.

In its motion, the City also urges that it was not deliberately indifferent because Officers could not have anticipated the injuries to Reed (Doc. 21 at 12). This entirely ignores the fact that the Officers killed Reed in yet another in a series of failed no-knock raids by Killeen PD that led to numerous injuries and at least two fatalities, including Dinwiddie's death. (Doc. 1 at 2).

On the contrary, the City's deliberate indifference is evident. The City has persisted in ignoring the need to retrain its officers in the constitutional limits on no-knock search warrants, despite calls for Killeen PD to suspend no-knock search warrants all together, and despite even further deaths and injuries when no-knock warrants continued. (*Id.*). Even after Reed lost his life during yet another unannounced raid, the City never gave Officers any additional training to ensure that no-knock searches are performed only when constitutionally justified. Nor did the City insist that Officer receive additional training on the constitutional limits of the use of force, even though it requires warning before using lethal force—a warning undoubtedly not given during the unannounced raid. Furthermore, none of the Officers were disciplined for their unconstitutional seizure or excessive force used against Reed.

This approval of the Officers' unconstitutional use of excessive force and unlawful seizure is "chargeable to the municipality because their decision is final," giving rise to municipal liability.

**D.     In the alternative, and only if this Court finds Plaintiff's claims deficient in any respect, Plaintiffs seek leave to amend their Complaint.**

As noted in detail above, Bright believes she has adequately pled sufficient claims against the City and, thus, the City's motion should be denied. However, if this Court believes the Complaint is in some way deficient, Bright respectfully asks for leave to amend her complaint.

"[L]eave to amend shall be freely given when justice so requires and should be granted absent some justification for refusal." *U.S. ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 386 (5th Cir. 2003) (citing Fed. R. Civ. P. 15(a)). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman*, 371 U.S. at 182. Thus, leave should be given unless the following factors weigh heavily against amendment: (1) undue delay; (2) bad faith or dilatory motive; (3) repeated failures to cure deficiencies by prior amendment; (4) undue prejudice to the opposing party; and (5) the futility of the amendment. *See U.S. ex rel. Hebert v. Dizney,* 295 Fed. Appx. 717, 724 (5th Cir. 2008).

Here, none of these factors are present. Accordingly, if Bright's allegations are deficient in some respect, she asks that she be granted leave to amend her Complaint.

## IV.     PRAYER

For these reasons, Plaintiff Diane Reed Bright, individually as the surviving mother of James Scott Reed, deceased, and as the personal representative for the Estate of Decedent James Scott Reed, respectfully asks that this Court deny Defendant the City of Killeen, Texas's Motion to Dismiss Plaintiff's Complaint Pursuant to Rule 12(b)(6) (Doc. 21) in its entirety. Plaintiff further respectfully requests all other relief to which she may be entitled.

Respectfully submitted,

By: */s/ Daryl K. Washington*

**Daryl K. Washington**
State Bar No. 24013714
dwashington@dwashlawfirm.com
**WASHINGTON LAW FIRM, PC**
325 N. St. Paul St., Suite 3950
Dallas, Texas 75201
Telephone: (214) 880-4883
Facsimile: (214) 751-6685

**ATTORNEY FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on **July 28, 2020**, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Western District of Texas, using the electronic case filing ("ECF") system of the Court. All counsel of record were served via electronic service through the ECF system.

**Charles D. Olson**
colson@haleyolson.com
**Michael W. Dixon**
mdixon@haleyolson.com
HALEY & OLSON, P.C.
100 N. Ritchie Road, Suite 200
Waco, Texas 76712
*Attorneys for Defendant*
*Anthony R. Custance*

**Roy L. Barrett**
barrett@namanhowell.com
**Joe Rivera**
jrivera@namanhowell.com
NAMAN, HOWELL, SMITH & LEE, PLLC
400 Austin Avenue, Suite 800
P.O. Box 1470
Waco, Texas 76703-1470
*Attorneys for Defendant the City of Killeen, Texas, Richard A. Hatfield, Jr., Fred L. Baskett, and Christian Suess*

*/s/ Daryl K. Washington*
**Daryl K. Washington**